

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

BRITT EASTERLY, )
)  DIVISION ONE
Plaintiff, )
)  No. 74840-8-I
ELZY EDWARDS and CLIFFORD )
EVELYN, )
)  UNPUBLISHED OPINION
Appellants, )
)
v. )
)
CLARK COUNTY, a municipal )
corporation; CLARK COUNTY )
SHERIFF'S OFFICE, a department )
of Clark County, )
)
Respondent. )
)  FILED:  June 13, 2016
)

DWYER, J. — Elzy Edwards, a person of color,[1] applied to be a custody

officer at the Clark County Sheriff's Office (the County) in 2007.  After not being

hired by the County, Edwards filed suit, claiming, in pertinent part, that the

County, in its hiring practices, had discriminated against him on the basis of his

race.  The trial court granted summary judgment, dismissing Edwards' claim.

Because unresolved material questions of fact exist as to whether Edwards' race

was a substantial factor motivating the County's decision not to hire him, we

reverse the trial court's summary dismissal of this claim.

Clifford Evelyn, a person of color, was a long-time employee with the

County.  After being terminated in 2009, Evelyn filed suit, claiming, in pertinent

---

[1] The appellants each self-identified as a "person of color" in their complaint.  Thus, the same term is used in this opinion.

part, that the County had subjected him to a hostile work environment on the basis of his race and had treated him disparately on the basis of his race. The trial court granted summary judgment, dismissing both of Evelyn's claims. We agree that no reasonable jury could find in Evelyn's favor on his disparate treatment claim and, thus, affirm the summary dismissal of this claim. However, because unresolved material questions of fact exist as to whether Evelyn was subjected to a hostile work environment on the basis of his race, we reverse the trial court's summary dismissal of this claim.[2]

I

On November 1, 2007, Elzy Edwards applied to work as a custody officer with the Clark County Sheriff's Office.

In Clark County, after filing an application, a custody officer applicant proceeds through a multi-stage process consisting of: (1) a written examination and physical agility test, (2) an oral board interview, (3) submission of a Personal History Statement (PHS),[3] (4) a background investigation (which includes an interview), (5) a "Rule of Three" panel interview,[4] (6) and, if selected by a "Rule of Three" panel,[5] referral to the Sheriff, who makes all hiring decisions.

Edwards proceeded through the application process. On November 16, Kathie Back, the County's chief civil service examiner, sent Edwards a letter.

---

[2] A third person of color, Britt Easterly, filed suit against the County alleging similar acts of discrimination. Easterly's claims are not a subject of this appeal.

[3] This document solicits information pertaining to an applicant's identity, current and former residences, employment history, financial history, and criminal record.

[4] Candy Arata, the County human resources manager, explained that "[a] Rule of Three is a panel interview before three individuals from the branch in which the individual is an applicant."

[5] Selection by a "Rule of Three" panel requires a consensus recommendation.

No. 74840-8-I/3

Therein, Back informed Edwards of the results of the first two stages of the application process.

> As a result of your successful interview for Custody Officer, your name has been merged onto the existing Custody Officer list of eligible candidates – according to final scores.[6] Therefore, your scores and rank are as follows:

| | |
|---|---|
| Written Exam (40%) | 78 |
| Oral Board Interview Score (60%) | 95[7] |
| Final Rank Score | 88 |
| Eligibility List Rank | 12 |

> . . . .
> The top five to ten candidates will be contacted in the near future to schedule the one-on-one background interview. All other candidates will be contacted as openings occur according to the list rank.

On November 28, Edwards submitted a PHS to Lois Hickey, a County human resources assistant. Thereafter, Hickey assigned sheriff's detective Timothy Hockett to be Edwards' background investigator. She forwarded Edwards' application and PHS to Hockett.

Upon receiving these documents, Hockett "undertook [his] usual process of reviewing Mr. Edwards['] application and PHS for completeness and accuracy and checked, among other things, Mr. Edwards' references, criminal history, and financial history." Edwards' application file contained at least one document that identified Edwards' race. Following this review, Hockett discovered that Edwards had failed to disclose two arrests and three misdemeanor charges[8] on his PHS.[9]

---

[6] A score of at least 70 percent was considered "passing."

[7] Edwards' oral board interview score was the second-highest score among all of the candidates who were interviewed for the same custody officer position.

[8] Edwards pled guilty to two of the misdemeanor charges. The third charge was dismissed.

Thereafter, Hockett telephoned Edwards to schedule his background interview. Following this conversation, Edwards' interview was scheduled for January 21, 2008. This date was Martin Luther King, Jr. Day. No other interviews were scheduled on this day.[10]

Edwards' interview was held as scheduled. During that interview, Hockett questioned Edwards at length regarding the information that he had attested to on his PHS.

Later that day, Edwards telephoned Back in order to express concern about Hockett's conduct during the interview.[11] The County had received other complaints concerning Hockett's conduct during interviews. These complaints were from Caucasian applicants.

Following Edwards' interview, Hockett wrote a detailed report, which he gave to Hickey. Therein, Hockett concluded that "Mr. Edwards's Personal History Statement (PHS) was incomplete and not accurate. Mr. Edwards is not a suitable candidate for the Custody Officer position." Ultimately, Hockett recommended that Edwards be removed from the eligibility list for the custody officer position.

Thereafter, Arata and Back listened to an audio recording of Edwards' interview. Both later opined that the manner in which Hockett questioned

---

[9] In its brief, the County suggests that Edwards was disqualified for several other additional reasons, which were set out on the PHS (and formed the basis of Hockett's recommendation that Edwards be removed from the custody officer selection process). However, upon conducting her investigation, attorney Jill Goldsmith found that Hockett "lacked judgment in coming to conclusions" about these other additional reasons for disqualification.

[10] January 21, 2008 was a regularly scheduled work day for Hockett.

[11] The record, in some places, indicates that Edwards contacted Back on the following day. This variance is of no significance.

Edwards was similar in kind to a criminal investigation interview rather than an employment investigation interview. Because other applicants had also complained about Hockett's conduct during their background interviews, Arata determined that Hockett should not continue conducting such interviews. Back then requested that a new investigator be assigned to Edwards' application. This never occurred. However, a new investigator was assigned to applicant Chris Settell, who was one of the Caucasian applicants that had complained about Hockett's conduct. Settell was later hired by the County.

Throughout the month of February, Edwards telephoned Back many times.[12]

On February 28, Back sent Edwards a certified letter,[13] informing him that he was being removed from the eligibility list for the custody officer position and that his removal was due, in part, to the omissions that he had made on his PHS.[14] In this letter, Back also informed Edwards of his right to appeal the County's decision to the Civil Service Commission (the Commission).

On March 4, Edwards wrote to Back, requesting an appeal to the Commission.

On April 10, Edwards appeared before the Commission.

---

[12] In both Edwards' complaint and a pretrial deposition, he asserted that these telephone calls were not returned. In Goldsmith's final report following her investigation, she noted that "[o]utgoing telephone calls from County phones are not recorded separately so there is no way to determine if Back called Edwards back every time he called her." Edwards' testimony, however, indicates that in February he made several telephone calls to Back that lasted from 13 to 18 minutes.

[13] Edwards never claimed this certified letter. Back later e-mailed the letter to Edwards.

[14] The other stated reason for Edwards' removal was "verbal domestic disturbances."

- 5 -

On April 24, Back wrote Edwards, notifying him that the Commission had reviewed his background investigation. Back informed Edwards that his "background was certified (approved) with reservations. Reservations are based on [the] concerns expressed previously."

Throughout the month of May, Edwards telephoned Back many times.[15]

After receiving a telephone call from Back, Breanne Nelson, a County human resources representative, invited Edwards to the next "Rule of Three" panel interview, which was scheduled for June 24. On that day, the panel was comprised of Commander Kimberly Beltran, Sergeant Robert Tuggle, and Officer Tim McCray. Nelson served as moderator. The panel was considering five applicants for three open positions.

Following the interviews, the panelists considered the applicants for each open position. After filling the first two positions, the panelists could not come to a consensus on the third, for which it was considering Edwards. Ultimately, Beltran and McCray concluded that Edwards was a sufficiently qualified candidate, while Tuggle concluded that he was not. Nelson asserts that, "[a]t no point during the Rule of Three process was any candidate's race ever mentioned."

The next day, Nelson brought the Rule of Three panel's failure to reach a consensus on the third open position to the attention of Undersheriff Joe Dunegan. Following a discussion with Nelson, Dunegan concluded that Edwards

---

[15] Again, Edwards contends that some of these telephone calls were not returned. However, Goldsmith's final report states that Back "recalls speaking to [Edwards] during this period."

- 6 -

should not be selected based on the concerns that were identified during Edwards' background investigation. Dunegan then requested both that Nelson draft a memorandum detailing his decision and inform Edwards of the County's decision. Nelson complied with these requests.

On July 3, Edwards wrote a letter to Rekah Strong, the County's diversity coordinator. Therein, once again, he expressed concern about the manner in which his application process was conducted. Thereafter, the County conducted an investigation.

As part of this investigation, the County hired an independent investigator, attorney Jill Goldsmith, to evaluate Edwards' concerns. Following this investigation, Goldsmith concluded that there were several procedural irregularities in the manner in which the County conducted Edwards' application process. As a result of these irregularities, Goldsmith recommended that Edwards be reinstated to the application process.[16]

On February 12, 2009, Francine Reis, the County's human resources director, wrote Edwards offering to reinstate him to the application process. Reis initially offered to reinstate Edwards to the background investigation stage of the application process. After Edwards expressed reservations, Reis then offered to reinstate him to the "Rule of Three" stage. Ultimately, Edwards, who had recently been hired by the Washington State Department of Corrections, declined the offer.

---

[16] Goldsmith recommended that Edwards be reinstated to the background investigation stage of the process.

On December 11, Edwards filed suit. Therein, he alleged that the County had engaged in unlawful race discrimination in violation of RCW 49.60.180 in connection with his application for the custody officer position. Edwards' allegation of race discrimination was based on the following evidence: (1) that Edwards' interview was the only interview that was scheduled on January 21, 2008—Martin Luther King, Jr. Day, (2) that prior to Edwards' background interview, Hockett had reviewed Edwards' application file, which contained at least one document that identified Edwards' race, (3) that Hockett had subjected Edwards to an unusually rigorous and long background interview, (4) that Chris Settell, a Caucasian custody officer applicant, was assigned a new investigator and later hired by the County, while Edwards was not, and (5) that Nelson had, prior to Edwards' panel interview, notified the "Rule of Three" panel about his removal and reinstatement to the eligibility list.[17] Edwards argued that these actions, taken together, supported an inference that Edwards' race was a substantial motivating factor in the County's decision not to hire him.

On May 30, 2014, the County moved for summary judgment on Edwards' claim. In so moving, the County countered Edwards' claim of race discrimination

---

[17] In Goldsmith's final report, she discussed her findings with regard to Nelson's potential influence on the "Rule of Three" panel's proceedings.

Nelson inappropriately attempted to prejudice the Rule of Three panel against Edwards, drawing attention to the negative aspects of his background instead of allowing the panelists to make their own decision. Nelson specifically drew the panelists' attention to the fact that Edwards had been removed and reinstated after an appeal to the [Civil Service Commission], telling the panelists that there had not been a case of someone removed and reinstated who had been hired (as we have seen from Settell's record, this was in any case untrue). Whether Nelson was motivated by discrimination, retaliation or her sincere belief that Edwards' background should preclude him from progressing is difficult to decide. Regardless of her motives, I find her actions were inappropriate.

with the following evidence: (1) Hockett did not realize that January 21 was Martin Luther King, Jr. Day until the morning of Edwards' interview, (2) background interviews had been conducted on various holidays over the years upon mutual agreement of the applicant and the interviewer, (3) Hockett was not aware of Edwards' race until they met on the morning of the interview, both because Hockett maintained that an applicant's race was "not something that [he] was interested in" and because Hockett believed that "race as specified in such reports [in an applicant's file] is notoriously inaccurate and unreliable," (4) Hockett sets aside four hour windows for all of the background interviews that he conducts, (5) Edwards' interview was longer than usual both because of the number of issues concerning Edwards' background that were raised by Hockett's investigation and because of Edwards' evasiveness during the interview;[18] (6) there were significant differences between Edwards' and Settell's background that justified their varying treatment, including that, unlike Edwards, Settell had no criminal history and had not omitted any arrests or convictions from his PHS, (7) Nelson's assertion that, "[a]t no point in time during our discussion did Undersheriff Dunegan ask nor did [she] mention Edwards' race or the race of any applicant," and (8) Undersheriff Dunegan's statement that at the time that he

---

[18] In Goldsmith's final report, she discussed her findings with regard to Hockett's interview style.

Edwards, like Settell, was subjected to an inappropriately conducted background interview by Detective Hockett in that Hockett's interviewing style treated both candidates as though they were criminal suspects instead of job applicants.
There is no evidence that Hockett's interviewing style varied from applicant to applicant based on race or other criteria; instead, the evidence is that he treated everyone in the same manner.

made his decision not to hire Edwards, "Nelson did not tell [him] the race of any applicant nor did [he] ask."

The County also presented statistical evidence concerning the 34 interviews that Hockett had performed during his tenure as a background investigator (from January 1, 2007 to March 1, 2008). These statistics indicated that of those 34 applicants, 21 were Caucasian (61.7 percent), five were Hispanic (14.7 percent), three were Black (8.8 percent), three were Asian (8.8 percent) and two were of unknown race (5.8 percent). Hockett passed only 5 of the 34 applicants through the background interview stage—an overall pass rate of 14.7 percent. Of the five who passed, one was Black, two were Hispanic, and two were Caucasian (one Caucasian was passed "with reservations"). Overall, 38 percent of Hockett's investigations were performed on non-Caucasians, but 60 percent of Hockett's passing evaluations were given to non-Caucasians.

The trial court granted summary judgment in favor of the County, dismissing Edwards' claim.

Edwards now appeals.

II

Edwards contends that the trial court improperly granted summary dismissal of his claim of discrimination in the County's hiring practices. This is so, he asserts, because there exist unresolved material questions of fact as to whether his race was a substantial factor motivating the County's decision not to hire him. We agree.

We review a trial court's grant of summary judgment de novo. Camicia v. Howard S. Wright Constr. Co., 179 Wn.2d 684, 693, 317 P.3d 987 (2014). Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); Camicia, 179 Wn.2d at 693. When making this determination, we consider all the facts and make all reasonable, factual inferences in the light most favorable to the nonmoving party. Young v. Key Pharms., Inc., 112 Wn.2d 216, 226, 770 P.2d 182 (1989).

Under Washington's Law Against Discrimination (WLAD), chapter 49.60 RCW, it is an unfair practice for an employer to refuse to hire any person on the basis of a protected characteristic, including race. RCW 49.60.180(1). "At trial, the WLAD plaintiff must ultimately prove that [the protected characteristic] was a 'substantial factor' in an employer's adverse employment action." Scrivener v. Clark Coll., 181 Wn.2d 439, 444, 334 P.3d 541 (2014). A "substantial factor" means that the protected characteristic was a significant motivating factor bringing about the employer's decision, not that the protected characteristic was the sole factor in the decision. Scrivener, 181 Wn.2d at 444.

"[S]ummary judgment to an employer is seldom appropriate in the WLAD cases." Scrivener, 181 Wn.2d at 445. To overcome summary judgment, a plaintiff needs to show only "that a *reasonable jury could find* that the plaintiff's protected trait was a substantial factor motivating the employer's adverse actions." Scrivener, 181 Wn.2d at 445 (emphasis added). "This is a burden of

production, not persuasion, and may be proved through direct or circumstantial evidence." Riehl v. Foodmaker, Inc., 152 Wn.2d 138, 149, 94 P.3d 930 (2004).

Where a WLAD plaintiff lacks direct evidence of discrimination, the burden-shifting analysis articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), is used to determine the proper order and nature of proof on summary judgment.[19]

> Under the first prong of the McDonnell Douglas framework, a plaintiff bears the initial burden of establishing a prima facie case of discrimination, which creates a presumption of discrimination.[20] Riehl, 152 Wn.2d at 149-50; Kastanis v. Educ. Emps. Credit Union, 122 Wn.2d 483, 490, 859 P.2d 26, 865 P.2d 507 (1993). Once the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Grimwood v. Univ. of Puget Sound, Inc., 110 Wn.2d 355, 363-64, 753 P.2d 517 (1988).
> "If the Defendant meets this burden, the third prong of the McDonnell Douglas test requires the Plaintiff to produce sufficient evidence that Defendant's alleged nondiscriminatory reason for [the employment action] was a pretext." Hume[ v. Am. Disposal Co.], 124 Wn.2d [656,] 667[, 880 P.2d 988 (1994)]. Evidence is sufficient to overcome summary judgment if it creates a genuine issue of material fact that the employer's articulated reason was a pretext

---

[19] Because the WLAD is patterned after Title VII of the Civil Rights Act of 1964, 42 U.S.C.2000(e)-2, Washington courts rely on federal decisions interpreting Title VII to decide issues under the WLAD. See, e.g., Oliver v. Pac. Nw. Bell Tel. Co., 106 Wn.2d 675, 678, 724 P.2d 1003 (1986); Haubry v. Snow, 106 Wn. App. 666, 674 n.7, 31 P.3d 1186 (2001).

[20] A prima facie case under McDonnell Douglas raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors. See [Int'l Bhd. of ]Teamsters v. United States,[431 U.S. 324,] 358 n.44[,97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977)]. And we are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with *some* reason, based his decision on an impermissible consideration such as race. Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577, 98 S. Ct. 2943, 57 L. Ed. 2d 957 (1978).

for a discriminatory purpose. Id. at 668; Grimwood, 110 Wn.2d at 364; Riehl, 152 Wn.2d at 150.

. . . .

. . . An employee may satisfy the pretext prong by offering sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is pretextual or (2) that although the employer's stated reason is legitimate, discrimination nevertheless was a substantial factor motivating the employer. Fell v. Spokane Transit Auth., 128 Wn.2d 618, 643 n.32, 911 P.2d 1319 (1996); see Wilmot v. Kaiser Alum. & Chem. Corp., 118 Wn.2d 46, 73, 821 P.2d 18 (1991); Grimwood, 110 Wn.2d at 365.

An employee does not *need* to disprove each of the employer's articulated reasons to satisfy the pretext burden of production. Our case law clearly establishes that it is the plaintiff's burden at trial to prove that discrimination was *a* substantial factor in an adverse employment action, not the only motivating factor. See Mackay[v. Acorn Custom Cabinetry, Inc.], 127 Wn.2d [302,] 309-11[, 898 P.2d 284 (1995)]. An employer may be motivated by multiple purposes, both legitimate and illegitimate, when making employment decisions and still be liable under the WLAD. See Id.

Scrivener, 181 Wn.2d at 446-47.

"If the plaintiff satisfies the McDonnell Douglas burden of production requirements, the case proceeds to trial, unless the judge determines that no rational fact finder could conclude that the action was discriminatory." Scrivener, 181 Wn.2d at 446.

At the summary judgment stage, a plaintiff's prima facie burden is "not onerous." [Texas Dep't of Cmty. Affairs v.]Burdine, 450 U.S. [248,] 253[,101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)]; see also Johnson[v. Dep't of Soc. & Health Servs.], 80 Wn. App. [212,] 227 n.21 [,907 P.2d 1223 (1996)]. The "requisite degree of proof necessary to establish a prima facie case . . . is *minimal* and does not even need to rise to the level of a preponderance of the evidence." Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir.1994) (emphasis added and omitted).

Fulton v. Dep't of Soc. & Health Servs., 169 Wn. App. 137, 152, 279 P.3d 500 (2012).

To establish a prima facie case of race discrimination in an employer's hiring practices, the plaintiff must show (1) that he or she belongs to a protected class, (2) that he or she applied and was qualified for a job for which the employer was seeking applications, (3) that despite his or her qualifications, he or she was rejected, and (4) that after his or her rejection, the position remained open and the employer continued to seek applications from other persons with comparable qualifications.[21] McDonnell Douglas, 411 U.S. at 802.

There is no real dispute that Edwards met his burden with respect to the first, third, and fourth elements of his prima facie case. As to the second element, that Edwards was qualified for the job that he was seeking, our focus is on whether Edwards put forth sufficient evidence from which a reasonable jury could find either that he possessed the minimum qualifications for the position or that his qualifications were comparable to those of the person who was awarded the position. Lyons v. England, 307 F.3d 1092, 1113-14 (9th Cir. 2002).

Edwards asserted to the trial court (and continues to assert on appeal) that he possessed the minimum qualifications for the custody officer position. To support this assertion, Edwards pointed the trial court to the passing scores that he earned on the examinations during the first two stages of the application process. With this evidentiary showing, Edwards both satisfied the requirements

---

[21] The elements of a prima facie case are not absolute but vary based on the relevant facts. See, e.g., Burdine, 450 U.S. at 253 n.6; McDonnell Douglas, 411 U.S. at 802 n.13; Grimwood, 110 Wn.2d at 363 (quoting Loeb v. Textron, Inc., 600 F.2d 1003, 1016-17 (1st Cir. 1979)).

- 14 -

of the second element and established a prima facie case of discrimination in the County's hiring practices.

Thus, the burden of production shifts to the County to articulate a legitimate, nondiscriminatory reason for declining to hire Edwards. "'[T]he employer's burden is satisfied if he simply explains what he has done or produc[es] evidence of legitimate nondiscriminatory reasons.'" Burdine, 450 U.S. at 256 (internal quotation marks omitted) (quoting Bd. of Trustees of Keene State Coll. v. Sweeny, 439 U.S. 24, 25 n.2, 99 S. Ct. 295, 58 L. Ed. 2d 216 (1978)). The County asserted to the trial court (and continues to assert on appeal) that it had a legitimate nondiscriminatory reason not to hire Edwards because he lacked the requisite honesty and integrity to be a custody officer. To support this assertion, the County pointed the trial court to the fact that Edwards failed to disclose the two arrests and three misdemeanor charges on his PHS. With this evidentiary showing, the County satisfied its burden of production to articulate a legitimate, nondiscriminatory reason for declining to hire Edwards.

Because the County articulated legitimate reasons for its actions, the burden of production shifts back to Edwards to offer sufficient evidence either that the County's proffered nondiscriminatory reason was pretextual or that, notwithstanding the County's proffered reason, Edwards' race was a substantial factor motivating the County's decision not to hire him. See Scrivener, 181 Wn.2d at 446-47; see also Burdine, 450 U.S. at 256 (a plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more

- 15 -

likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence").

Edwards presented such evidence.

In response to the County's proffered reason (that he was unqualified by reason of dishonesty for the custody officer position), Edwards pointed to evidence that the County twice offered to reinstate him to the custody officer selection process. Viewing this evidence in the light most favorable to Edwards, a reasonable jury could infer that an employer would not make such an offer to an applicant whom the employer truly believed lacked the minimum qualifications for the position.[22] This is evidence that the County's proffered reason was pretextual.[23]

Edwards also presented circumstantial evidence that his race may have been a substantial factor motivating the County's decision not to hire him by pointing to evidence that his interview was the only one that was scheduled on Martin Luther King, Jr. Day, that Hockett had access to at least one document in Edwards' application file that identified Edwards' race, and that a Caucasian applicant who was later hired by the County was assigned a new investigator after complaining about Hockett's conduct, while Edwards was not.

---

[22] This assumes that the jury views the offers as being good faith offers. Were the jury to view the offers as being made in bad faith (i.e., the offers of reinstatement were a ruse and Edwards' fate—not to be hired—was already determined) such bad faith might also cause the jury to view the County's "legitimate reason" as being pretextual.

[23] Arata testified to her belief that Edwards was "mistakenly approved" to be reinstated to the Rule of Three stage of the application process. This goes to the weight of the evidence and is an argument properly presented to the jury. On summary judgment, it does not negate that circumstantial evidence of pretext was presented.

In response, the County presented evidence that Edwards' race was not a substantial factor motivating its hiring decision by demonstrating that 20 percent of the applicants to whom Hockett gave passing evaluations to were Black and that, in total, 60 percent of the applicants to whom he gave passing evaluations were non-Caucasian.

Taken together, the evidence presented by Edwards and the County raise competing inferences from which a reasonable jury could infer either discriminatory or nondiscriminatory intent. These competing inferences, in turn, create a genuine issue of material fact concerning whether Edwards' race was a substantial factor motivating the County's decision not to hire him. "When the record contains reasonable but competing inferences of both discrimination and nondiscrimination, the trier of fact must determine the true motivation." Scrivener, 181 Wn.2d at 445. Because jury questions are presented, summary dismissal was improperly granted. That order is reversed.

III

Clifford Evelyn was hired as a custody officer by the County on July 17, 1989. During Evelyn's tenure, he received several promotions, eventually assuming the rank of commander. As a commander, Evelyn reported to Chief Deputy Jackie Batties. Batties and Evelyn are of the same race.

At some point prior to May 7, 2008, Evelyn was having lunch with Chief Batties and Commander Kimberly Beltran, a Caucasian, at a restaurant near their workplace. The three where engaged in conversation when Chief Batties stated, "[w]ell, you know, I have a problem with black men that date white

- 17 -

women." Evelyn was dating a Caucasian woman at the time. Chief Batties was aware of this fact. Chief Batties later admitted to making this remark and stated that she apologized for doing so.[24]

On appeal, Evelyn avers that Batties' remark is "direct evidence of racially biased attitudes toward [him], which is the wellspring from which all of the other hostility emanated."[25] Br. of Appellant at 38. In this regard, the evidence supporting Evelyn's hostile work environment claim is based on numerous acts that he alleges took place over the course of his employment. Thus, his argument goes, these acts—when viewed in light of Chief Batties' remark and considering the totality of the circumstances—can be causally linked to support his hostile work environment claim.[26] The acts upon which he relies are:

(1) Evelyn's assertion that inmates would call him "nigger" in front of Caucasian commanders, who would laugh and not correct the inmates.

(2) On October 4, 2005, Evelyn wrote Chief Batties an e-mail. Therein, he expressed concern that a Caucasian colleague, Commander Nikki Costa, was not appropriately documenting her vacation time. He followed up this e-mail with a letter on October 9. Therein, he reiterated his concerns about Commander Costa.

---

[24] The record does not indicate the exact date on which the remark about interracial dating was made. We use May 7, 2008 as a reference point because Evelyn mentioned the remark in an internal complaint that he submitted on this date.

[25] In its brief, the County contends that Batties' remark about interracial dating is not direct evidence of racial animus. In doing so, the County asserts that Batties' remark is a statement about unprotected conduct (i.e., who Evelyn chooses to date), not a statement about a protected characteristic such as race. It is for the trier of fact to assign—or not assign—significance to the statement. On its face, the statement is one of race-based animus.

[26] In its brief, the County asserts that there is a "common sense maxim that individuals of the same race are less likely to discriminate against each other on the basis of race." Br. of Respondent at 43. The law does not support this supposed "common sense" viewpoint. See, e.g., Castaneda v. Partida, 430 U.S. 482, 499, 97 S. Ct. 1272, 51 L. Ed. 2d 498 (1977) ("Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group."); see also Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 82, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998) (same-sex sexual harassment actionable under Title VII).

In his complaint, Evelyn averred that "Chief Jackie Batties did not forward the complaint for investigation and consideration by Internal Affairs. Instead, the investigation was dismissed by the Undersheriff Joe Dunegan. The result was a written directive redefining the procedure to document time off."

(3) In 2007, the County entered into a contract with Wexford Health Sources, Inc., who was hired to provide medical services to inmates. In his complaint, Evelyn averred that he had "expressed concerns about Wexford's performance under the contract and about how its failures of performance were endangering inmates and jail staff" but that the issues about which he expressed concern "continued unabated."

(4) On January 3, 2008, Evelyn's colleague, Britt Easterly, found two pictures—one posted in the jail classification office and another posted on the outside of the transport door that was near the jail classification office—that depicted a dark-skinned male wearing a feathered head ornament and a grass skirt. A caption, written in ink below the pictures, stated, "871 on vacation." 3871 was Easterly's badge number.

(5) On February 5, Evelyn tripped while exiting an elevator and fell onto a passerby, Sandi Vosberg.[27] He grabbed onto Vosberg's shoulders in an effort to prevent himself from falling. Thereafter, Vosberg filed a complaint of unwanted touching against Evelyn. On February 13, the County exonerated Evelyn of any wrongdoing.

In his complaint, Evelyn averred that on this occasion:

"Chief Batties signed off on [ ] Vosburg's [sic] complaint and forwarded it to Internal Affairs without informing [ ] Evelyn of the allegations, thus denying [ ] Evelyn the opportunity to verify or contradict the reported events. This action by Chief Batties was contrary to her routine practice with regard to other commanders."

(6) On February 27, Evelyn sent an e-mail to a fellow employee regarding the liability associated with a staff member of the employee who had lost a sheriff's office identification badge. Thereafter, Evelyn notified the corrections manager, Pam Clark, of his correspondence with the

---

[27] In the County's internal complaint, the complaining party's name is spelled "Sandi Vosberg." Elsewhere in the record, the complaining party's name is spelled "Sandy Vosburg." We adopt the spelling of the complaining party that is reflected in the County's internal complaint.

employee. On March 4, Batties came to Evelyn's office to speak with him about his e-mail correspondence.

In his complaint, Evelyn averred that on this occasion:

"Chief Batties abrasively confronted [ ] Evelyn in his office about the e-mail exchange between him and Ms. Clark. Without permitting [ ] Evelyn to respond to what had occurred, she told [ ] Evelyn that his emails to Ms. Clark were inappropriate. While doing so, Chief Batties raised her voice while the door to [ ] Evelyn's office was open and within earshot of support staff. Chief Batties then isolated [ ] Evelyn with differential treatment for appropriately two weeks by, among other actions, personally addressing other staff members and commanders, but saying nothing to [ ] Evelyn and refusing to make eye contact with him."

(7) On March 6, Evelyn sent an e-mail to Batties. Therein, Evelyn expressed that he was uncomfortable with how Batties had handled a situation between his colleague, Custody Officer Lamar Elliott, a person of color, and Commander Mike Anderson, a Caucasian. Elliott had requested permission from Anderson to wear his uniform while off-duty to serve breakfast at a school function for his child. Anderson denied Elliott's request. In doing so, Anderson allegedly made a remark to Elliott that it would be embarrassing if he got egg on his shirt.

On March 11, Chief Batties wrote Evelyn a letter. Therein, she set forth her expectation that, among other things, Evelyn no longer engage in "angry E-mail, finger pointing." Ultimately, Chief Batties notified Evelyn that he should "[c]onsider this a corrective counseling and if it happens again, I will give you an oral reprimand."

(8) On September 25, Andrea Arnason,[28] a Wexford employee, submitted a complaint against Evelyn. Therein, Arnason asserted, among other things, that Evelyn had made "lewd, inappropriate, and discriminatory" remarks toward her. Candy Arata, the County's human resources Manager, conducted an investigation into these allegations.

---

[28] The record indicates that the complaining party refers to herself as "Andrea Arnason." In the record, her surname is sometimes given as "Aranson." We adopt her spelling of her own name.

In his complaint, Evelyn asserted that the evidence obtained from the County's investigation into these allegations was the product of "several biased interviews."[29]

The last act on this list, the allegedly biased sexual harassment investigation, resulted in Evelyn's termination on June 25, 2009. Prior to terminating Evelyn's employment, the County offered him the opportunity to voluntarily separate from service via a retirement agreement. Evelyn declined the offer.

On December 11, Evelyn filed suit. Therein, he alleged that the County had subjected him to both a hostile work environment and disparate treatment on the basis of his race, in violation of RCW 49.60.180.

In asserting his hostile work environment claim, Evelyn pointed the trial court to Batties' remark about interracial dating and the numerous aforementioned acts of alleged hostility.

Evelyn also presented testimony from Penny Harrington, who testified as an expert witness "with regard to policies and practices in paramilitary

---

[29] The law allows Evelyn to aggregate this evidence in an attempt to establish a hostile work environment claim.

> The continuing violation doctrine is intended to address a series of acts that collectively constitute conduct based upon a discriminatory purpose. The doctrine provides that when a series of discriminatory acts occurs to create a cause of action for hostile work environment, all of the conduct may be considered when some of the related acts that arise out of the same discriminatory animus occur within the statute of limitations. Antonius[v. King County, 153 Wn.2d [256,] 263[, 103 P.3d 729 (2004)]. The plaintiff must establish one or more acts based upon the same discriminatory animus within the statute of limitations. Id. at 271.

Crownover v. Dep't of Transp., 165 Wn. App. 131, 141-42, 265 P.3d 971 (2011). Although the statutory limitation period is not at issue herein, the doctrine allows Evelyn to rely on the acts, in aggregation, and to rely on one act to give context to other acts.

organizations such as police and fire departments." Harrington reviewed the County's investigation into the sexual harassment allegations against Evelyn and opined that "this investigation became more of a witch hunt than the neutral investigation it should have been." Harrington placed particular focus on Arata, who she opined had "tainted the investigation." Harrington elaborated, stating that, among other things, Arata "asked leading questions of the witnesses,"[30] "frequently interrupted the people she was interviewing, thereby not getting their complete statements,"[31] repeated or rephrased questions without being asked to do so by a witness, and "repeatedly did share" the testimony that she obtained from previous witnesses with future witnesses.[32]

Finally, Evelyn presented his own testimony, and that of his colleagues, Britt Easterly and Gerald Haynes,[33] who spoke to their beliefs regarding how the County treated them during the course of their employment. Evelyn asserted his belief that Batties and Undersheriff Dunegan would approve "another commander's proposal, which was essentially what I had proposed before but had seen shot down by Jackie." Ultimately, Evelyn opined that he "felt targeted" both by "how Jackie Batties handled matters involving [him]" and by "how the investigation against [him] for sexual harassment was handled." Easterly

---

[30] In a deposition, Arata was asked why she did not ask open-ended questions. She responded, "I asked the questions that I needed answered."

[31] When deposed, Arata was also asked whether she had any concerns about interrupting a witness 20 times in a 42-page transcript. She responded, "[n]o." When questioned further, she stated that she was not concerned because she "got the information I needed from [the witness]."

[32] Arata was also asked whether it was a good investigatory practice to interject a description of what a prior witness had said during a subsequent witness's interview. She responded, "You can call it good or you can call it bad. . . . It was a means to an end."

[33] Haynes is also a person of color.

- 22 -

testified that, "African American officers were not held as examples or given the opportunity that others were given." Easterly elaborated, stating that, "I saw retribution from staff members when I asserted myself or my opinions. I was often labeled a bully, yet when white officers behaved in the same manner and within the guidelines set forth by the County, they were touted as innovative or promotable." Consistent with Easterly's testimony, Haynes attested that, "I learned, and I knew others too believe, that you had to keep quiet and not make waves if you wanted to survive in the department." Concerning Evelyn in particular, Haynes testified that, "I saw Evelyn trying to do something about the situation we African–American custody officers were doing. I also saw him work hard to try to make sure the inmates were properly provided for." Ultimately, Haynes opined that Evelyn "was targeted" for these actions.

In asserting his disparate treatment claim, Evelyn pointed the trial court to a comparator, Commander Don Polan, who was a Caucasian employee about whom the County had received similar harassment complaints. In doing so, Evelyn averred that the County allowed Polan to resign in lieu of termination.

On May 30, 2014, the County moved for summary judgment on Evelyn's claims. In so moving, the County countered both of Evelyn's claims.

Regarding Evelyn's disparate treatment claim, the County averred that it had not treated Evelyn disparately on account of his race. To support its assertion, the County pointed the trial court to evidence that, as with Polan, Evelyn was offered an opportunity to resign in lieu of termination but that, unlike Polan, Evelyn declined to do so.

Regarding Evelyn's hostile work environment claim, the County asserted that Evelyn "fail[ed] to establish a severe or pervasive racially hostile work environment." Further, the County averred that each act upon which Evelyn relied was "handled consistent with policy." To support its assertions, the County offered the following evidence:

(1) In a deposition, Evelyn was questioned about the circumstances surrounding Batties' remark about interracial dating. In response to a question asking Evelyn to recall the context of the conversation that led up to Batties' remark, he testified, "I can't remember exactly what the conversation was." Evelyn further testified to his belief that Batties, "might have been . . . talking about her son" when she made the remark.

(2) When deposed, Evelyn was questioned about the use of the "N" word by inmates. In response to a question asking Evelyn whether he had personally experienced Caucasian employees laughing when inmates utilized the "N" word, or whether he had heard about it, he testified, "I heard about it from other officers."

(3) When deposed, Evelyn was also questioned about how Batties treated him when she issued performance reviews and discipline. In response to a question asking Evelyn if Chief Batties gave him favorable performance reviews he testified, "[y]es." In response to a question asking Evelyn if the discipline that Batties imposed on him was minor, he testified, "I believe it was."

(4) When deposed, Evelyn was also questioned about whether Batties had offered for him to document his vacation in the same manner as Commander Costa. In response to a question asking Evelyn if Batties had said to him "[w]ell, you know, if you consider this to be some kind of perq that Nikki Costa is getting, go ahead and do it yourself. You can get the same thing[,]" he testified, "[y]eah, she did, she authorized me to do it."

(5) When deposed, Evelyn was also questioned about whether he considered the County's treatment (and resolution) of Vosberg's complaint to be evidence of discrimination against him on the basis of his race. In response to a question asking Evelyn if he considered the Vosberg incident to be evidence of racial discrimination against him, Evelyn testified, "No, but it bothered me."

(6) Both Evelyn and his colleague, Lamar Elliott, were deposed about the circumstances surrounding Elliott's request to wear his uniform to his child's school. In response to a question asking Evelyn if he believed that Anderson's comment to Elliott had some racial undertones, Evelyn testified, "[y]es."

When deposed, Elliott was questioned about whether Anderson later contacted him to apologize. Elliott testified that Anderson "contacted me and asked me to come down to his office." When questioned about what happened in Anderson's office, Elliott stated his belief that the incident was "becoming more - a bigger issue than I thought it would become. And [Anderson] apologized. And I took it as an apology."

(7) In a declaration, Batties asserted her belief that Evelyn "was frequently rude, disrespectful and insubordinate to me."

(8) The County also presented the report that Arata wrote following the County's internal investigation into the sexual harassment allegations against Evelyn.

During that investigation, 32 witnesses were interviewed (including Evelyn). Seventeen of the 32 witnesses were proposed by Evelyn. The report contained testimony from many female employees detailing the sexual nature of the comments that Evelyn had allegedly made.

During Arnason's interview, she was questioned about the type of comments that Evelyn had allegedly made. Arnason stated that Evelyn "has made comments that I found offensive towards me." As an example, Arnason stated that Evelyn had told her, "[t]hat shirt looks very becoming on you, especially in the chest area."

Kelly Epperson, the director of nursing, was also interviewed. During Epperson's interview, she stated that Evelyn "says a lot of sexual things." Epperson recalled many statements as examples.

First, on one occasion, Evelyn walked into Epperson's office and said, "[h]ey boob, how's it going?" Second, Evelyn would approach Epperson and say, "[w]ow, you must be cold today, because –" while pointing to her breasts. Third, on one occasion, Epperson was discussing the fact that she had a new boyfriend with Evelyn when he stated, "[y]eah, white guys don't know how to have sex very well, but I could ride you so hard and you'd be so wet [that] you wouldn't be able to walk straight for three days." Fourth, Epperson recalled that Evelyn

- 25 -

had told her "[o]nce you go black you never go back," and she stated that he, in fact, "says it all the time."

Nancy Reudink, an administrative assistant, was also interviewed. During Reudink's interview, she stated that Evelyn would make "[s]exual innuendos, just inappropriate comments," toward her. Reudink also recalled many statements as examples.

First, she stated that "[w]ell, [Evelyn] played – he liked to, like, he'd come up and get candy, take the candy wrappers, and apparently he thought my cleavage was a basketball hoop." Second, Reudink recalled that "the issue of sex came up and he would tell me that [my boyfriend] doesn't know how to please me, he would do me all night long." Reudink elaborated, stating that Evelyn had told her that he would "[r]ide me like I ride my Harley." Third, Reudink stated that Evelyn would tell her that she has "big tits."

Julie Higgins, a physician assistant who worked in the medical unit from October 2007 to April 2008, was also interviewed. During Higgins' interview, she stated that Evelyn would make comments that were "inappropriate" and "made me feel uncomfortable." Higgins recalled two comments as examples.

First, on one occasion, Evelyn came into a room where she was pumping breast milk and stated, "[y]ou got all of that out of your tit?" Second, on another occasion, Evelyn was walking past Higgins when he said, "[y]our ass is fine."

The trial court granted summary judgment in favor of the County, dismissing both of Evelyn's claims.

Evelyn now appeals.

IV

Evelyn first contends that the trial court improperly granted summary dismissal of his hostile work environment claim. This is so, he asserts, because there exist unresolved material questions of fact as to whether the County, throughout the tenure of his employment (up to and including his termination), subjected him to a hostile work environment on the basis of his race. We agree.

- 26 -

> To establish a prima facie hostile work environment claim, a plaintiff must show the following four elements: "(1) the harassment was unwelcome, (2) the harassment was because [plaintiff was a member of a protected class], (3) the harassment affected the terms and conditions of employment, and (4) the harassment is imputable to the employer." [Antonius v. King County, 153 Wn.2d 256,] 261 [,103 P.3d 729 (2004)]. The third element is satisfied if the harassment is "'sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment[,] . . . to be determined with regard to the totality of the circumstances.' " Id. (alterations in original) (quoting Glasgow v. Ga.-Pac. Corp., 103 Wn.2d 401, 406–07, 693 P.2d 708 (1985)).
>
> . . . .
> The standard for linking discriminatory acts together in the hostile work environment context is not high. "The acts must have some relationship to each other to constitute part of the same hostile work environment claim." Antonius, 153 Wn.2d at 271.

Loeffelholz v. Univ. of Wash., 175 Wn.2d 264, 275-76, 285 P.3d 854 (2012).

There is no real dispute that Evelyn met his burden with respect to the first and fourth elements of his prima facie case. Thus, our focus is on the second and third elements.

Regarding the second element, whether the harassment was because of Evelyn's race, the record does not establish either the context surrounding Batties' remark about interracial dating or the exact date on which it was made. However, viewing Batties' remark in the light most favorable to Evelyn, given that Evelyn was the only male person of color who was participating in the conversation at the time that the remark was made, and given that Batties knew that Evelyn was dating a Caucasian woman at the time, a reasonable jury could infer that Batties intended to express racial animus toward Evelyn. At the same time, Evelyn testified both that he could not "remember exactly what the

conversation was" on that day, and that he believed Batties "might have been . . . talking about her son" when she made the remark.

Taken together, the evidence presented by Evelyn and the County raise competing inferences from which a reasonable jury could infer either the existence or non-existence of racial animus toward Evelyn. These competing inferences, in turn, create a genuine issue of material fact concerning whether the alleged acts of harassment were substantially motivated by Evelyn's race. Jury questions are presented. See Scrivener, 181 Wn.2d at 445.

Having established that there is a genuine issue of material fact with regard to whether or not Evelyn's race was a substantial motivating factor in the alleged acts of harassment, it follows that the causal relationship (if any) between Batties' statement and the alleged acts of hostility as they relate (if at all) to the terms and conditions of Evelyn's employment is also a question for the jury. The County avers that Evelyn did not meet his burden as to this element because Batties' "one-time, stray comment" was not sufficiently pervasive to constitute a hostile work environment. Br. of Respondent at 40. This is a factual determination that is properly reserved for the jury, to be made based on the totality of the circumstance surrounding the work environment, including the other evidence of animus advanced by Evelyn. Thus, summary dismissal of Evelyn's hostile work environment claim was improper. Scrivener, 181 Wn.2d at 445. That order is reversed.

V

Evelyn next contends that the trial court improperly granted summary dismissal of his disparate treatment claim. This is so, he asserts, because there exist unresolved material questions of fact as to whether his race was a substantial factor motivating the County in taking an adverse employment action against him. We disagree.

The same summary judgment and burden shifting principles that were set forth previously apply to the resolution of Evelyn's disparate treatment claim. See Johnson, 80 Wn. App. at 226-30 (applying the McDonnell Douglas framework to a disparate treatment claim based on race).

Under the WLAD, it is an unfair practice for an employer to discriminate against any person in the terms or conditions of his or her employment on the basis of a protected characteristic, including race. RCW 49.60.180(3).

To establish a prima facie case of disparate treatment based on race, a plaintiff must show (1) that he or she belongs to a protected class, (2) that he or she was treated less favorably in the terms or conditions of his or her employment (3) than a similarly situated, nonprotected employee, and (4) that he or she and the nonprotected "comparator" were doing substantially similar work. Washington v. Boeing Co., 105 Wn. App. 1, 13, 19 P.3d 1041 (2000).

There is no real dispute that Evelyn met his burden with respect to the first, third, and fourth elements of his prima facie case. As to the second element, whether Evelyn was treated less favorably in the terms or conditions of his employment, our focus is on whether Evelyn put forth sufficient evidence from

which a reasonable jury could infer that "[t]he [County] simply treats some people less favorably than others because of their race." Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977)).

Evelyn did not present such evidence.

The County offered both Evelyn and Polan (his comparator) an opportunity to retire in lieu of receiving the adverse employment action of termination. Polan accepted the County's offer of retirement while Evelyn did not. In such a circumstance, Evelyn fails to establish the second element of his prima facie case—that he was treated less favorably in the terms and conditions of his employment. Evelyn elected not to accept the offer. He cannot "elect" himself into a cause of action. The County treated both the comparator and him similarly. Thus, the trial court properly granted summary judgment in favor of the County on Evelyn's disparate treatment claim.

Reversed in part, affirmed in part, and remanded.

We concur: