[No. 29043-3-III.   Division Three.   November 29, 2011.]

JAMES CROWNOVER ET AL., *Appellants*, v. THE DEPARTMENT OF TRANSPORTATION, *Respondent*.

132

134

*George Fearing*, for appellants.

*Robert M. McKenna, Attorney General*, and *Amy C. Clemmons, Assistant*, for respondent.

¶1 BROWN, J. — Employees Jim Crownover, Harold Delgado, Roy Gilliam, Joel Havlina, and Kelli Ginn appeal the summary dismissal of their discrimination suit against their employer, Washington State's Department of Transportation (Department). Together, they contend the trial court's ruling ignores summary judgment jurisprudence and genuine issues of material fact remain regarding the hostile work environment, discriminatory employment conditions, and retaliation claims. Mr. Crownover, Mr. Gilliam, and Ms.

Ginn contend erroneous constructive discharge rulings. Mr. Crownover, Mr. Delgado, Mr. Gilliam, and Mr. Havlina contend their claims are not time barred. We reject all contentions and affirm.

## FACTS

¶2 In this summary judgment review, we view the facts in the light most favorable to the employees. *City of Spokane v. Spokane County*, 158 Wn.2d 661, 671, 146 P.3d 893 (2006).

¶3 Mr. Crownover, Mr. Delgado, Mr. Gilliam, and Mr. Havlina worked as highway maintenance technicians for the Department on the Connell crew. Kelli Ginn worked on the Pasco crew as a maintenance technician. Sometimes the two crews worked together. Mr. Gilliam was a lead technician for the Connell crew. The Department's management team is Tom Root, Michael D. Kukes, and Tom Lenberg. Mr. Root served as the maintenance and operations superintendent. Mr. Kukes became supervisor for Pasco and Connell in 1999. In 2001, he rose to Assistant Superintendent for Pasco, Connell, and Prosser. Mr. Lenberg became the Pasco supervisor in February 2001, at which time he assumed supervisory duties over the Connell crew as well.

¶4 The Department's policy manual prohibits violence, threats, and intimidation in the workplace and directs supervisors and managers to prevent such misconduct.

¶5 In the last half of the 1990s, Jim Leroue was lead technician for the Connell crew. Mr. Leroue had a temper and often engaged in angry outbursts. According to Mr. Crownover, Mr. Leroue threatened many times to beat him up. Mr. Crownover asked Superintendent Root for a transfer because of Mr. Leroue's conduct; Superintendent Root refused. He gave Mr. Crownover the option of staying or leaving employment with the Department. Because Mr. Gilliam was the senior member of the Connell crew, Mr. Crownover and Mr. Havlina spoke to Mr. Gilliam about Mr.

Leroue's angry comments. In turn, during 1999, Mr. Gilliam repeatedly reported the threatening behavior of Mr. Leroue to Mr. Kukes. In 1999, Mr. Delgado overheard Mark Brewster, Pasco's lead technician, make sexual comments and use inappropriate language.

¶6 In 2000, the Connell crew wrote a no-confidence letter concerning Mr. Leroue. After the no-confidence letter, Julie Lougheed investigated. As a result, Superintendent Root grew angry at the Connell crew. Superintendent Root addressed the Connell crew the day after the no-confidence letter and expressed concern that the crew would destroy Mr. Leroue's career. Ms. Lougheed found that Mr. Leroue intimidated the Connell crew. Superintendent Root threatened the Connell crew members with closing the Connell maintenance facility and transferring the crew to Pasco.

¶7 In fall 2000, Mr. Brewster commented to Mr. Crownover he would like to "break in" his 16-year-old daughter. Clerk's Papers (CP) at 448. Mr. Crownover was offended.

¶8 In fall 2001, Mr. Kukes spoke with the Connell crew, including Mr. Crownover, Mr. Havlina, Mr. Delgado, and Mr. Gilliam at the Connell shop, allegedly mentioning that another superintendent's daughter had been used as a mattress by another employee. The young woman was Mr. Havlina's cousin. Mr. Havlina asked Mr. Kukes to stop making inappropriate comments, but he refused. Mr. Gilliam reported the incident to the human resources consultant, but Mr. Kukes was not disciplined.

¶9 In summer 2001, Connell crew member Max Yager told many racial and sexual jokes. Mr. Yager told a joke about a black man working in a watermelon field and having sex with watermelons. Mr. Crownover, among others, was offended by Mr. Yager's jokes. Mr. Yager focused much of his crude and racist remarks upon Hispanic Connell crew member Mr. Delgado. Mr. Gilliam told Mr. Yager to end the racist ridicule.

¶10 In fall 2003, while the Connell crew worked in Pasco, Mr. Yager approached Mr. Delgado and asked, "What color's my skin?" CP at 880. Mr. Delgado responded, "White." *Id.* Mr. Yager asked, "What color's your skin?" *Id.* Mr. Delgado responded, "Brown." *Id.* Mr. Yager then declared, "Well, you [Delgado] get in the back." *Id.* Mr. Crownover overheard Mr. Yager's remarks.

¶11 During a shift meeting in the winter of 2004, the crew, including Ms. Ginn, was eating hot dogs. Mr. Lenberg said in a crude voice to another coworker, "[Y]ou want a bite of my wiener?" CP at 889. Ms. Ginn was offended by the remark.

¶12 Mr. Brewster was one of Ms. Ginn's lead technicians. He occasionally supervised the Connell crew. Mr. Crownover related Mr. Brewster bullied employees by yelling in their faces. Mr. Crownover felt Mr. Brewster was obsessed with sex and often remarked about sex with men or women. Mr. Brewster made several racial and sexual remarks to Mr. Gilliam and Mr. Havlina. After he became a supervisor in 2000 and before Mr. Brewster became a supervisor shortly after, Mr. Gilliam told Pasco management about Mr. Brewster's remarks, but there was no response.

¶13 At a meeting in the fall of 2003, Mr. Crownover told Superintendent Root about the inappropriate sexual comment Mr. Brewster earlier made about Mr. Crownover's daughter in 2001. Superintendent Root responded, "[I]f someone told [me] he would fuck [my] daughter, [I] would tell [him] that [I] will fuck his wife the next morning." CP at 448. Ms. Ginn was subjected to Mr. Brewster's behavior and complained to Mr. Lenberg. No action was taken. In 2003, Mr. Lenberg commented Ms. Ginn needed to be a "cheerleader" for management. CP at 891.

¶14 In October 2003, Ms. Lougheed investigated Mr. Brewster's actions. She attempted to interview department employees but found the majority were afraid to be interviewed. One employee complained, "[N]othing's going to be done about it anyway, so . . . why say anything?" CP at 744.

Pasco management, on the other hand, reported Mr. Brewster "was doing really well." CP at 712. In her December 2003 findings, Ms. Lougheed sustained some complaints of sexual harassment and intimidation against Mr. Brewster. She concluded Mr. Brewster intimidated employees.

¶15 Superintendent Root reminded Mr. Brewster to adhere to department policies and procedures. The Connell crew complained Mr. Brewster was not adequately disciplined. After the Brewster investigation, Regional Administrator Casey McGill met with the Connell crew. Mr. Gilliam asked union steward Susan Dinneen to attend the meeting. According to Ms. Dinneen, the Connell crew feared retribution. At the meeting, the Connell crew described Mr. Brewster's behavior and asked not to work with him. The Connell crew questioned whether Pasco management should remain as supervisors, as they failed to end Mr. Brewster's conduct. Mr. Lenberg, Mr. Kukes, Superintendent Root, and Mr. Brewster remained in their positions. According to the employees after this incident, Pasco management increased the amount of time the Connell crew worked in Pasco under the direction of Mr. Brewster. The employees believed this was complaint retaliation.

¶16 In March 2004, Mr. Brewster told Mr. Havlina he would be working with the Connell crew in Pasco and they would have some "quality time." CP at 309. The meaning of "quality time" is not explained and is disputed. And in 2004, Mr. Lenberg and Mr. Brewster assigned Mr. Crownover "grunt" work in Pasco; Mr. Crownover believed this was complaint retaliation. Mr. Gilliam was reprimanded for the Connell crew's purportedly failing to properly place signs at a burn site. He felt the reprimand was unfair because Mr. Gilliam was not working as lead technician that day because of a doctor's appointment. Mr. Havlina's performance evaluations had been excellent before the Brewster investigation, but the evaluations thereafter plummeted. Pasco

management gave preference for spray jobs to another employee over Mr. Havlina. Mr. Kukes often called the Connell crew "water asses." CP at 681.

¶17 Mr. Crownover suffered anxiety and depression while working for the Department and resigned in 2005. Mr. Delgado was terminated in 2005 for his inability to physically perform the duties of a maintenance technician. Mr. Gilliam gave notice of terminating employment on January 3, 2006 and took sick leave and annual leave from August 15, 2005 to January 3, 2006; Mr. Gilliam quit even though Ms. Lougheed offered him a transfer to a different shop away from Connell. Ms. Ginn developed carpal tunnel syndrome and claimed emotional distress and other physical ailments due to management harassment. On October 13, 2005, Ms. Ginn resigned from employment, submitting a letter complimentary of her work experience with the Department. Mr. Havlina was terminated in 2005 for his inability to physically perform the duties.

¶18 The employees sued the Department in 2005, alleging individual claims of hostile work environment, wrongful discharge, retaliation, and discrimination.[1] The court summarily dismissed all of Mr. Crownover's claims, partly dismissed Mr. Delgado's claims but allowed his racial discrimination and failure to accommodate claims to proceed, dismissed all of Mr. Gilliam's claims, dismissed all of Ms. Ginn's claims, and dismissed all of Mr. Havlina's claims. The trial court concluded Mr. Crownover's, Mr. Delgado's, Mr. Gilliam's, and Mr. Havlina's hostile work environment and discrimination claims were time barred. The employees appealed.

---

[1] The employees amended their complaint to add a sixth employee, Shirley Bumpaous. The parties later settled and she is not included in this appeal.

## ANALYSIS

### A. Statute of Limitations

¶19 The issue is whether the trial court erred in summarily dismissing Mr. Crownover's, Mr. Delgado's, Mr. Gilliam's, and Mr. Havlina's hostile work environment claims as time barred. They contend the continuing violation doctrine tolls the limitations period.

¶20 We review a decision to grant summary dismissal de novo. *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300, 45 P.3d 1068 (2002). "A motion for summary judgment based on a statute of limitations should be granted only if the record demonstrates that there is no genuine issue of material fact as to when the statutory period commenced." *Zaleck v. Everett Clinic*, 60 Wn. App. 107, 110, 802 P.2d 826 (1991).

¶21 The statute of limitations for actions involving a discriminatory hostile work environment is three years. *Antonius v. King County*, 153 Wn.2d 256, 261-62, 103 P.3d 729 (2004). The limitations period starts when a cause of action accrues. A cause of action accrues when a party has the right to seek relief in the courts. *Colwell v. Eising*, 118 Wn.2d 861, 868, 827 P.2d 1005 (1992). A cause of " 'action accrues when the plaintiff knows or should know the relevant facts, whether or not the plaintiff also knows that these facts are enough to establish a legal cause of action.' " *Gilbert v. Sacred Heart Med. Ctr.*, 127 Wn.2d 370, 381, 900 P.2d 552 (1995) (Durham, C.J., dissenting) (quoting *Allen v. State*, 118 Wn.2d 753, 758, 826 P.2d 200 (1992)).

¶22 *Mr. Crownover.* Below, Mr. Crownover made two responsive limitation arguments: (1) a six-year statute of limitations applies and (2) the continuing violation doctrine applies. Regarding the first argument, the court correctly decided no contract claim was pleaded warranting the six-year limitation statute. The continuing violation doc-

trine is intended to address a series of acts that collectively constitute conduct based upon a discriminatory purpose. The doctrine provides that when a series of discriminatory acts occurs to create a cause of action for hostile work environment, all of the conduct may be considered when some of the related acts that arise out of the same discriminatory animus occur within the statute of limitations. *Antonius*, 153 Wn.2d at 263. The plaintiff must establish one or more acts based upon the same discriminatory animus within the statute of limitations. *Id.* at 271.

¶23 Mr. Crownover's complaint was based on an offensive comment made in the fall of 2000 about his daughter. He admits no objectionable sexual conduct was directed at him or comments made that he complained about to anyone. Mr. Crownover does not identify any sexual harassment within the statutory limitation period but argumentatively asserts otherwise. Established law specifically distinguishes between discrete adverse employment actions and a series of sexual comments that could collectively constitute discrimination. Discrete discriminatory acts or retaliatory employment action must always be within the statute of limitations to be actionable. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-16, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002). Under the statute of limitations, "the employee cannot recover for the previous acts, at least not by reference to [an unrelated timely act]." *Id.* at 118.

¶24 Retaliatory conduct cannot be combined with the alleged discrimination to avoid the statute of limitations on the hostile work environment claim. In *Burkhart v. American Railcar Industries, Inc.*, 603 F.3d 472, 475 (8th Cir. 2010), the plaintiff complained about sexual e-mails and comments that occurred outside of the statute of limitations and complained about being shunned, suspended, and terminated within the statute of limitations. The plaintiff sought to claim that all of the conduct was part of one hostile work environment claim, including the sexual e-mails and comments and the alleged retaliatory actions. *Id.*

The court rejected this argument because there was no evidence that the sexually explicit e-mails or comments continued. *Id.* The alleged retaliatory acts could not be considered sexual harassment. *Id.* at 476. Thus, the plaintiff's sexual harassment claim was time barred. *Id.*

¶25 Similarly, Mr. Crownover fails to identify conduct motivated by gender discrimination within the statute of limitations. The 2000 comment Mr. Crownover claims as the basis for his complaint came well before his suit was filed in September 2005, well outside of the statute of limitations. The retaliatory conduct he alleges does not alter the statute of limitations on his hostile work environment claim. The trial court correctly applied the three-year statute of limitations.

¶26 *Mr. Delgado.* Mr. Delgado's hostile work environment allegation concerns sexually engendered comments occurring in 1999. He sued in 2005. Like Mr. Crownover's claim, Mr. Delgado's claim is time barred. Indeed, Mr. Delgado's sole response to the statute of limitations defense was to assert the six-year statute of limitations. The court correctly decided a three-year statute of limitations applies.

¶27 *Mr. Gilliam.* Mr. Gilliam was not subject to sexual or gender-related conduct directed at him. He asserts he became aware of alleged sexually engendered comments and conduct asserted by other plaintiffs, all of which occurred outside of the three-year limitation period. He sued in 2005. He admitted he could not identify any objectionable conduct directed at him between 2002 and 2006. The law requires some of the alleged acts directed at the particular plaintiff to occur within the statute of limitations in order for the claim to be timely filed. *Antonius,* 153 Wn.2d at 263-64. Under *Morgan,* a "court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice." *Morgan,* 536 U.S. at 120. Because Mr. Gilliam fails to identify any discriminatory conduct within the statute of limitations, the trial court properly dismissed his claim.

144

■ ¶28 *Mr. Havlina.* The *Morgan* reasoning requires the court to assess the nature and relatedness of the timely and untimely conduct. *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 76 (2d Cir. 2010). When looking at the statute of limitations for a hostile work environment claim, the court must start by asking if the plaintiff alleged any act motivated by discrimination within the limitations period, and then determine if the untimely conduct was part of " 'the same actionable hostile work environment' " that occurred within the statute of limitations. *Antonius*, 153 Wn.2d at 271 (quoting *Morgan*, 536 U.S. at 120). Courts must consider whether the acts " 'involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers.' " *Morgan*, 536 U.S. at 120 (alteration in original) (quoting *Morgan v. Nat'l R.R. Passenger Corp.*, 232 F.3d 1008, 1017 (9th Cir. 2000)). Acts that are " 'so discrete in time or circumstances that they do not reinforce each other' " do not constitute a single hostile work environment in order to defeat the statute of limitations. *Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 727 (7th Cir. 2004) (quoting *Tinner v. United Ins. Co. of Am.*, 308 F.3d 697, 708 (7th Cir. 2002)). We agree Mr. Havlina's alleged facts do not meet the above standards.

■ ¶29 In *Lovelace v. BP Products North America, Inc.*, 252 Fed. Appx. 33, 40 (6th Cir. 2007), Ms. Lovelace complained about 12 comments related to race that the court described as in "poor taste and offensive." The court decided she offered solely her subjective belief that these incidents were racially motivated and interfered with her work. "Such subjective and conclusory allegations are insufficient to create a genuine issue of material fact regarding whether the work environment was racially hostile." *Lovelace*, 252 Fed. Appx. at 41.

¶30 Here, the sole event reported within the statute of limitations by Mr. Havlina is a 2004 comment made by Mr. Brewster to the whole Connell crew about spending quality

time together in Pasco. This does not reasonably and objectively allow us to conclude the conduct was sexual in nature or motivated by gender discrimination. Mr. Havlina himself initially acknowledged he did not know if it was sexually based. He simply subjectively claimed offense because he did not want to work in Pasco. This facially innocuous conduct is not similar in nature to the sexually charged statement in the 1990s, and does not meet the *Antonius* and *Morgan* standards. Asserting subjective offense to spending quality time working together cannot prevent summary judgment dismissal. Thus, the trial court properly dismissed Mr. Havlina's hostile work environment claim.

## B. Ms. Ginn's Separate Claims

¶31 First, Ms. Ginn separately contends the trial court erred in summarily dismissing her hostile work environment claim based on failure to demonstrate a prima facie case.

¶32 To establish a hostile work environment claim, a plaintiff must prove the harassment (1) was unwelcome, (2) was because he or she is a member of a protected class, (3) affected the terms and conditions of his or her employment, and (4) was imputable to his or her employer. *Domingo v. Boeing Emps.' Credit Union*, 124 Wn. App. 71, 84, 98 P.3d 1222 (2004). To satisfy the third element, the harassment must be sufficiently pervasive so as to alter his or her working conditions. *Washington v. Boeing Co.*, 105 Wn. App. 1, 10, 19 P.3d 1041 (2000). It is not sufficient that the conduct is merely offensive. *Adams v. Able Bldg. Supply, Inc.*, 114 Wn. App. 291, 296, 57 P.3d 280 (2002).

¶33 Ms. Ginn does not allege any unwelcome sexual conduct by a department employee other than that of a co-worker who was punished by demotion. She does not show the conduct was gender related. The employee's gender must be the " 'motivating factor' " for the conduct. *Payne*

*v. Children's Home Soc'y of Wash., Inc.*, 77 Wn. App. 507, 514, 892 P.2d 1102 (1995). So long as the conduct is " 'because of sex,' " it need not be "sexual in nature," or "involve sexual advances, innuendo, or physical conduct to be actionable." *Id.* at 510. "[E]mbarrassment, humiliation or mental anguish arising from nondiscriminatory harassment" is insufficient. *Adams*, 114 Wn. App. at 298. Instead, the plaintiff must prove the conduct would not have occurred had the employee been of a different gender. *Schonauer v. DCR Entm't, Inc.*, 79 Wn. App. 808, 820, 905 P.2d 392 (1995). When the plaintiff is a female, she must prove that the conduct was "based on animus toward women." *Adams*, 114 Wn. App. at 298.

¶34 Mr. Brewster's and Mr. Lenberg's comments, while crude, do not appear to be directed at Ms. Ginn because she was a woman. The objectionable treatment attributed to Mr. Brewster and Mr. Lenberg was directed at both males and females. Indeed, even the comment that Ms. Ginn be a cheerleader is not necessarily gender based since both males and females may be cheerleaders. It is insufficient that the employer's conduct is merely offensive or vulgar. *Adams*, 114 Wn. App. at 296. Casual, isolated, or trivial incidents do not affect the terms or conditions of employment to a sufficiently significant degree to violate the law. *Payne*, 77 Wn. App. at 515. The conduct "must be so extreme as to amount to a change in the terms and conditions of employment." *Adams*, 114 Wn. App. at 297. The cheerleader comment by Mr. Lenberg does not meet the *Payne* standard.

¶35 Finally, an employer is liable for sexual harassment if the employer (1) authorized, knew, or should have known about a supervisor's or co-worker's harassment because it was open or obvious and (2) failed to take reasonably prompt and adequate corrective action. *See Francom v. Costco Wholesale Corp.*, 98 Wn. App. 845, 853, 991 P.2d 1182 (2000) (citing *Glasgow v. Ga.-Pac. Corp.*, 103 Wn.2d 401, 407, 693 P.2d 708 (1985)). This element can be

met if an employer's conduct does not " 'end the harassment' " complained of by the employee. *Id.* at 853 (quoting *Glasgow*, 103 Wn.2d at 407). Because no complaints specifically alleging sexual harassment were made that the Department failed to address, any newly alleged behavior by Ms. Ginn cannot be imputed. Given our analysis, she fails to establish a prima facie case of hostile work environment.

¶36 Second, Ms. Ginn contends disparate treatment because the Department did not give her light duty work when she was injured but would give male employees light duty work when needed. To establish a prima facie disparate treatment case, an employee must show that (1) he or she belongs to a protected class, (2) he or she was treated less favorably in the terms or conditions of employment, (3) a similarly situated employee outside of the protected class received the benefit, and (4) the employees were doing substantially the same work. *Johnson v. Dep't of Soc. & Health Servs.*, 80 Wn. App. 212, 227, 907 P.2d 1223 (1996).

¶37 Ms. Ginn received Labor and Industry benefits for time off and a surgery related to her carpal tunnel. The Department provided a light duty assignment to Ms. Ginn based on her doctor's recommendation. In addressing Ms. Ginn's light duty argument, the trial court found, "There's no indication to the Court of disparate treatment or failure to accommodate her disability when—[the light duty request] was properly documented to the employer." Report of Proceedings (Jan. 15, 2008) at 130. The trial court was correct; Ms. Ginn does not show she was treated less favorably in the terms or conditions of employment than a similarly situated employee outside the protected class. Accordingly, her disparate treatment claim fails.

## C. Retaliation Claims

¶38 The issue is whether the trial court erred in summarily dismissing the employees' retaliation claims by failing to recognize remaining genuine issues of material fact.

¶39 RCW 49.60.210(1) forbids employers to discharge or otherwise discriminate against an employee in retaliation for opposing practices forbidden by the Washington Law Against Discrimination. To avoid summary judgment, the employee must first show a prima facie case of retaliation: (1) The employee engaged in a statutorily protected activity, (2) the employer took adverse employment action against her, and (3) there is a causal link between the protected activity and the adverse action. *Milligan v. Thompson*, 110 Wn. App. 628, 638, 42 P.3d 418 (2002). Once a prima facie case is established, the burden then shifts to the employer to show a legitimate purpose for the adverse employment action. *Id.* If the employer shows a legitimate purpose, the burden shifts back to the employee to show that this legitimate reason was pretextual. *Id.*

¶40 Adverse employment action means a tangible change in employment status, such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998). All five employees fail to show an adverse employment action.

¶41 Combining their claims, the employees allege the Department retaliated by assigning the Connell crew to work in Pasco, assigning grunt work, unfairly reprimanding, providing unfavorable work evaluations, and failing to end the hostile work environment. The hostile work environment argument claims are either barred by the statute of limitations or unsubstantiated. Regarding the other retaliation claims, the Department showed more work in the Pasco area required help from the Connell crew; Mr. Gilliam was properly reprimanded in the burn site incident, work was assigned as needed to the most qualified employee, and work evaluations were based on performance. Thus, the Department establishes a legitimate purpose for its actions. The burden then shifts to the employees to show the given reasons were pretext for retaliation. *Milligan*, 110

Wn. App. at 638. The employees fail to show pretext and fail to establish a prima facie retaliation claim. Therefore, the trial court did not err in summarily dismissing those claims.

## D. Constructive Discharge Claims

¶42 The issue is whether the trial court erred in dismissing Mr. Crownover's, Mr. Gilliam's, and Ms. Ginn's constructive discharge claims.

¶43 To prove constructive discharge, the employees must show (1) the employer deliberately made the employee's working conditions intolerable, (2) a reasonable person would be forced to resign, (3) the employee resigned solely because of the intolerable conditions, and (4) the employee suffered damages. *Campbell v. State*, 129 Wn. App. 10, 23, 118 P.3d 888 (2005). An employee's frustration, and even receipts of direct or indirect negative remarks, is not enough to show intolerable working conditions. *Boeing Co.*, 105 Wn. App. at 10. A voluntary resignation "occurs when an employee abandons the employment because of a desire to leave." *Barrett v. Weyerhaeuser Co. Severance Pay Plan*, 40 Wn. App. 630, 638, 700 P.2d 338 (1985). A resignation will still be voluntary when an employee resigns because he or she is dissatisfied with the working conditions. *Binkley v. City of Tacoma*, 114 Wn.2d 373, 388-89, 787 P.2d 1366 (1990).

¶44 *Mr. Crownover.* While Mr. Crownover claims he suffered anxiety and depression while working for the Department, the working conditions were not intolerable. For the reasons discussed above, he has not demonstrated a hostile or retaliatory work environment at the time he resigned. While Mr. Crownover was dissatisfied, this does not to make his resignation involuntary.

¶45 *Mr. Gilliam.* Mr. Gilliam argues his taking excessive sick leave before he resigned evidences an intolerable work environment. But, like Mr. Crownover, he fails to show a hostile or retaliatory work environment at the time of his

resignation. He was offered a transfer to another area, but he refused. Similar to Mr. Crownover, Mr. Gilliam cannot show his resignation was involuntary.

¶46 *Ms. Ginn.* Ms. Ginn resigned when she suffered from carpal tunnel syndrome. She therefore reported she wanted to pursue another line of work. Her voluntary resignation letter states, "I would like to take this moment to thank you for the opportunity that I have had working for the Department of Transportation. I have learned a lot of valuable tools and worked with many wonderful people. I have come to a decision that I need to prepare for my future and accomplish goals that I have set for myself. I do not believe that staying with the department would be a benefit to obtaining these goals." CP at 946. She had no pending claims for gender discrimination or hostile work environment at that time. Ms. Ginn related no deliberate oppressive actions by the Department for her resignation. She shows no factual or legal basis for her constructive discharge claim. The trial court properly dismissed it.

### E. Summary Judgment Jurisprudence

¶47 The final issue is whether the trial court's summary judgment grant in favor of the Department defies summary judgment jurisprudence. All five employees argue summary judgment should not be granted in employment discrimination cases.

¶48 In *Sangster v. Albertson's, Inc.*, 99 Wn. App. 156, 160, 991 P.2d 674 (2000), this court noted, "Summary judgment should rarely be granted in employment discrimination cases." But, this court recognized the employee " 'must do more than express an opinion or make conclusory statements' "; he or she "must establish specific and material facts to support each element of her prima facie case." *Id.* (quoting *Marquis v. City of Spokane*, 130 Wn.2d 97, 105, 922 P.2d 43 (1996)). Here, the employees failed to establish

specific and material facts to support the elements of their claims. Thus, summary judgment dismissal was appropriate.

¶49 Affirmed.

KULIK, C.J., and SIDDOWAY, J., concur.

Review denied at 173 Wn.2d 1030 (2012).