# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| MICHAEL HOOVER, | ) | No. 77023-3-I |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PAM BADGER; AARON JEIDE, | ) | |
| MICHAEL LONG; PEGGY WOLF; | ) | |
| DEAN VOELKER; KING COUNTY | ) | |
| SOLID WASTE DIVISION, and | ) | |
| KING COUNTY, a municipal | ) | UNPUBLISHED OPINION |
| corporation, | ) | |
| | ) | FILED: September 24, 2018 |
| Respondents. | ) | |

VERELLEN, J. — Michael Hoover challenges the trial court's grant of summary judgment dismissing his hostile work environment and disparate treatment claims against his employer, King County.

The court properly dismissed Hoover's hostile work environment claim as time barred because he fails to identify any discriminatory conduct within the statute of limitations. The court also properly dismissed Hoover's disparate treatment claim because he fails to show King County's actions were related to race or that he suffered a sufficiently adverse employment action.

In conjunction with summary judgment, the court did not err in striking certain photographs because Hoover failed to lay an adequate foundation. And

the court did not err in striking hearsay statements because Hoover failed to provide reasoning to support the admission of a deceased coworker's statement to Hoover about a supervisor's use of an extremely offensive racial slur.

Therefore, we affirm.

## FACTS

Hoover, an African-American, works within the solid waste division (SWD) at King County. Since 1998, he has worked at the Cedar Hills facility as a waste screener.

In April 2016, Hoover filed this case against Pam Badger, Dean Voelker, Michael Long, Aaron Jeide, Peggy Wolf, and King County. In his complaint, Hoover brought claims for hostile work environment, disparate treatment, breach of implied contract, and negligent retention of an employee.

Pam Badger supervised Hoover from the early 2000s until 2005. Dean Voelker supervised Hoover from 2005 to 2012. And Michael Long has supervised Hoover since 2012. Aaron Jeide is the human resources manager at SWD. And since the early 2000s, Hoover and Peggy Wolf have worked together at Cedar Hills. Wolf is the main subject of Hoover's complaint.

On April 17, 2017, King County moved for summary judgment. On May 15, 2017, the trial court granted the motion and dismissed Hoover's hostile work environment and disparate treatment claims.

Hoover appeals.

ANALYSIS

I. Summary Judgment

Hoover contends the trial court erred in granting King County's motion for summary judgment.

An order granting summary judgment is reviewed de novo.[1] Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law."[2] The evidence is viewed in the light most favorable to the nonmoving party.[3]

The Washington State Law Against Discrimination (WLAD) prohibits employment discrimination based on race.[4] The legislature requires the courts to liberally construe the WLAD "to accomplish its antidiscrimination purpose."[5]

Washington courts generally disfavor summary judgment in employment discrimination cases "because of the difficulty of proving a discriminatory motivation."[6] "To overcome summary judgment, a plaintiff needs to show only that a reasonable jury could find that the plaintiff's protected trait was a substantial

---

[1] Loeffelholz v. University of Washington, 175 Wn.2d 264, 271, 285 P.3d 854 (2012).

[2] CR 56(c); see Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 552, 192 P.3d 886 (2008).

[3] Loeffelholz, 175 Wn.2d at 271.

[4] RCW 49.60.180.

[5] Blackburn v. Dep't of Soc. & Health Svcs., 186 Wn.2d 250, 257, 365 P.3d 1076 (2016) (quoting RCW 49.60.020).

[6] Scrivener v. Clark Coll., 181 Wn.2d 439, 445, 334 P.3d 541 (2014); see also Johnson v. Dep't of Soc. & Health Svcs., 80 Wn. App. 212, 226, 907 P.2d 1223 (1996); Sangster v. Albertson's, Inc., 99 Wn. App. 156, 160, 991 P.2d 674 (2000).

factor motivating the employer's adverse actions. "'This is a burden of production, not persuasion, and may be proved through direct or circumstantial evidence.'"[7] If the plaintiff lacks direct evidence of discrimination, Washington courts turn to the burden shifting analysis.[8]

Under the burden shifting analysis from McDonnell Douglas Corp. v. Green,[9] "a plaintiff bears the initial burden of establishing a prima facie case of discrimination, which creates a presumption of discrimination."[10] The "prima facie burden is 'not onerous.'"[11] But the employee "must do more than express an opinion or make conclusory statements."[12] The employee must establish "specific and material facts to support each element of his or her prima facie case."[13]

If the plaintiff establishes a prima facie case, the burden shifts to the employer to prove a "legitimate, nondiscriminatory reason for the adverse employment action."[14] And if the employer meets this burden, the plaintiff can still

---

[7] Scrivener, 181 Wn.2d at 445 (internal quotation marks omitted).

[8] Id. (quoting Riehl v. Foodmaker, Inc., 152 Wn.2d 138, 149, 94 P.3d 930 (2004))

[9] 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

[10] Scrivener, 181 Wn.2d at 446.

[11] Fulton v. Dep't of Soc. & Health Svcs., 169 Wn. App. 137, 152, 279 P.3d 500 (2012) (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)).

[12] Hiatt v. Walker Chevrolet Co., 120 Wn.2d 57, 66, 837 P.2d 618 (1992).

[13] Id. (emphasis omitted).

[14] Scrivener, 181 Wn.2d at 446.

defeat summary judgment by producing evidence that the employer's alleged nondiscriminatory reason was a pretext.[15]

A. *Hostile Work Environment Claim*

Hoover argues he presented sufficient evidence of a hostile work environment to defeat summary judgment. He specifically contends the trial court erred in refusing to consider acts occurring outside the statute of limitations.

> The four elements of a prima facie hostile work environment claim are (1) the harassment was unwelcome, (2) the harassment was because of [race], (3) the harassment affected the terms and conditions of employment, and (4) the harassment is imputable to the employer.[16]

Hostile work environment claims are different from claims involving discrete discriminatory acts because "[t]heir very nature involves repeated conduct."[17] "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'"[18]

For this reason, when considering a hostile work environment claim, "'[i]t does not matter, for purpose of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period.'"[19]

> As a unitary whole, the claim is not untimely if one of the acts occurs during the limitations period because the claim is brought after the practice, as a whole, occurred and within the limitations period. The

---

[15] Id. at 446.

[16] Antonius v. King County, 153 Wn.2d 256, 261, 103 P.3d 729 (2004).

[17] National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002)).

[18] Id. at 117 (quoting 42 U.S.C. § 2000e-5(e)(1)).

[19] Antonius, 153 Wn.2d at 264 (alteration in original) (quoting id.).

acts must be, however, "part of the same unlawful employment practice."[20]

Here, the trial court dismissed Hoover's hostile work environment claim "because the acts complained of since the commencement of the limitations period fail to establish conduct so severe or pervasive" that it affected the terms and condition of Hoover's employment.[21]

Hoover filed this case in June 2016, and the statute of limitations period began to run in April 2013.[22] In the time prior to the limitations period, Hoover presented evidence of a number of incidents that he argued contributed to a hostile work environment.

In 2001, Wolf told Hoover that she feared him and that "she felt that [he] would bodily hurt her."[23] Hoover reported the incident to Badger. Badger initially responded, "I really don't know where she's coming from, she probably had a sheltered life or something."[24] Badger went on to say, "Well, you are a big burly guy . . . and you're a black guy too."[25]

In 2004 or 2006, Wolf sat on Hoover's lap during a meeting. In her declaration, Wolf acknowledged her poor judgment in sitting on Hoover's lap.

---

[20] Id. at 266 (footnote omitted) (quoting Morgan, 536 U.S. at 122).

[21] Clerk's Papers (CP) at 1404.

[22] WLAD claims are subject to the general three-year statute of limitations for personal injury actions. Antonius, 153 Wn.2d at 261-62 (citing RCW 4.16.080(2)). For claims against local governmental entities, the statute of limitations is tolled for 60 days upon the filing of an administrative tort claim. RCW 4.96.020(4).

[23] CP at 463, 1004.

[24] CP at 464, 1004.

[25] Id.

After the incident, Hoover sent an e-mail to Wolf asking her not to do this again, and Wolf agreed. And Wolf did not sit on Hoover's lap again.

In 2008, during a meeting with Wolf, Hoover, and Voelker, Wolf revealed she had taped a conversation between herself and Hoover, without Hoover's knowledge. Wolf was subsequently disciplined, in the form of a written reprimand, for "[u]nprofessional conduct," failure to "respect the rights of others," and failure to "handle conflict appropriately."[26] Also in 2008, an unknown declarant referred to Hoover and another African-American coworker as "two apes in a zoo."[27]

In 2009, Hoover overheard a Caucasian coworker refer to a group of African-American SWD employees as "their group" and say, "they are good at car washing."[28] Also in 2009, Voelker referred to music Hoover was listening to as "jungle rap crap music."[29]

In 2010, Wolf told Hoover and another African-American coworker, that "back in those days," they would have worked for her, referring to herself as the "lady of the house."[30]

In 2011, Mike Nicholas, a Caucasian SWD employee, drove a large compactor into Hoover's vehicle. In his response to interrogatories, Hoover claimed Voelker demanded Hoover submit to a drug test. Hoover also claimed

---

[26] CP at 354.
[27] CP at 652, 855.
[28] CP at 652.
[29] CP at 579, 652.
[30] CP at 1005.

Nicholas "was allowed to leave work, go home, and was not subjected to take any drug test," whereas "Hoover was not permitted to leave work and go home."[31]

But in Jeide's declaration, he stated neither Hoover nor Nicholas could have been drug tested per King County's drug testing policy. According to Jeide, he and Voelker instructed Hoover to "see a doctor to check for any potential injury," but Hoover refused treatment and wanted to remain at work.[32] Jeide also indicated that "[t]here was a significant investigation of the events that took place that day and we ultimately concluded that Mr. Nicholas was negligent in his operation of the compactor that day and he received a lengthy disciplinary suspension without pay."[33]

Finally, at an unspecified point in 2013, Wolf addressed Hoover as her "little house boy."[34] Without providing any argument, Hoover implies he is entitled to a reasonable inference that this incident occurred within the limitations period. But without further evidence to pinpoint the timing of Wolf's statement, Hoover cannot satisfy his burden of proof.

During the limitations period, Hoover presented only one incident he argued contributed to his hostile work environment claim. In November 2013, Hoover claimed Wolf had a hazardous waste receptacle, a "clamshell," moved for her convenience and against work protocol. In her declaration, Wolf claimed she asked Lee Momon, the transfer station coordinator, to move the clamshell for

---

[31] CP at 653.

[32] CP at 341.

[33] CP at 342.

[34] CP at 655, 1005.

better access. When Hoover reached out to Long and Badger (then Long's supervisor) about the move, Long contacted Momon, and Momon confirmed that he moved the clamshell for Wolf.

The trial court determined the incidents were "discrete and unconnected to one another" and, although some of incidents could be "characterized objectively as racist in nature[,] . . . [t]he remainder do not appear to be racist in nature."[35]

In Crownover v. Department of Transportation, a group of maintenance employees sued their employer, Washington State Department of Transportation, alleging individual claims of hostile work environment.[36] The trial court dismissed the employees' claims as time barred.[37]

One of the plaintiffs, Jim Crownover, complained of an offensive comment about his daughter.[38] The comment occurred outside the limitations period, and he did not identify any sexual harassment within the limitations period. Division Three of this court concluded the trial court correctly applied the three-year statute of limitations and affirmed the trial court's dismissal of Crownover's hostile work environment claim.[39]

Another plaintiff, Joel Havlina, complained of a supervisor's comment to the maintenance crew about "spending quality time together."[40] Division Three

---

[35] CP at 1416.

[36] 165 Wn. App. 131, 140, 265 P.3d 971 (2011).

[37] Id.

[38] Id. at 142.

[39] Id. at 143.

[40] Id. at 144-45.

determined, "This does not reasonably and objectively allow us to conclude the conduct was sexual in nature or motivated by gender discrimination. . . . Asserting subjective offense to spending quality time working together cannot prevent summary judgment dismissal."[41]

Similar to Crownover, Hoover fails to identify any discriminatory conduct within the statute of limitations. He fails to show that the November 2013 clamshell incident, the only incident within the limitations period, was related to race. Hoover's subjective belief that the incident was related to race is not enough to establish a prima facie case of discrimination. And because that incident is discrete from the discriminatory comments that occurred prior to the limitations period, Hoover cannot defeat the statute of limitations.

The trial court also determined that Hoover failed to prove the acts were imputable to King County.[42]

Harassment may be imputed to an employer in two ways.[43]

> First, it can be imputed to the employer if the harasser is an owner, partner, corporate officer, or manager. Second, it can be imputed to the employer if the harasser is the plaintiff's supervisor or co-worker if the employer "authorized, knew, or should have known of the harassment and . . . failed to take reasonably prompt and adequate corrective action."[44]

---

[41] Id. at 145.

[42] CP at 1404 (Hoover "further fails to provide sufficient facts since 2013 that would allow this court to impute liability to the County.").

[43] Davis v. Fred's Appliance, Inc., 171 Wn. App. 348, 362, 287 P.3d 51 (2012).

[44] Id. (alteration in original) (quoting Glasgow v. Georgia-Pacific, Corp., 103 Wn.2d 401, 407, 693 P.2d 708 (1985)).

Even assuming the single timely incident was related to race, Hoover cannot establish that Long, his supervisor at the time, failed to take reasonably prompt and adequate corrective action. When Hoover contacted Long about the November 2013 clamshell incident, Long quickly followed up with Momon about Hoover's concerns.

We conclude the trial court did not err in granting King County's motion for summary judgment and dismissing Hoover's claim of hostile work environment.

B. *Disparate Treatment Claim*

Hoover also contends he presented sufficient evidence to overcome summary judgment on his disparate treatment claim.

Under the WLAD, it is unlawful for an employer "[t]o discriminate against any person in compensation or other terms or conditions of employment because of . . . race."[45] Disparate treatment occurs when an "employer simply treats some people less favorably than others because of their race" or other protected category.[46]

> To establish a prima facie disparate treatment case, an employee must show that (1) he or she belongs to a protected class, (2) he or she was treated less favorably in the terms or conditions of employment, (3) a similarly situated employee outside of the protected class received the benefit, and (4) the employees were doing substantially the same work.[47]

---

[45] RCW 49.60.180(3).

[46] Blackburn, 186 Wn.2d at 258.

[47] Crownover, 165 Wn. App. at 147.

The primary inquiry is whether the employee presented sufficient evidence to create an inference that the employer's decision was based on race.[48] A disparate treatment claim also requires "'an actual adverse employment action, such as a demotion or adverse transfer.'"[49] An adverse employment action "must involve a change in employment conditions that is more than an 'inconvenience or alteration of job responsibilities.'"[50] An adverse employment action is generally limited to tangible employment actions that constitute a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[51]

Hoover contends King County treated him differently because his supervisors failed to address behavior and job performance issues with similarly situated employees.

The trial court dismissed Hoover's "disparate treatment allegations unrelated to hiring or promotions because plaintiff fails to establish employment actions sufficient to support this claim."[52]

---

[48] 1 LINDEMANN, BARBARA T., GROSSMAN, PAUL & WEIRICH, C. GEOFFREY, EMPLOYMENT DISCRIMINATION LAW, 2-24 to 2-25 (5th ed. 2012).

[49] Kirby v. City of Tacoma, 124 Wn. App. 454, 465, 98 P.3d 827 (2004) (quoting Robel v. Roundup Corp., 148 Wn.2d 35, 74 n.24, 59 P.3d 611 (2002)).

[50] Id. (quoting DeGuiseppe v. Vill. of Bellwood, 68 F.3d 187, 192 (7th Cir. 1995)); see also Alonso v. Qwest Commc'ns Co., LLC, 178 Wn. App. 734, 746, 315 P.3d 610 (2013) (an adverse employment action must involve "a change in employment conditions, such as "reducing an employee's workload and pay").

[51] Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998).

[52] CP at 1404.

Similar to Hoover's hostile work environment claim, most of the incidents Hoover provides to support his disparate treatment claim are outside the statute of limitations.

Prior to April 2013, Hoover claims his supervisors repeatedly failed to investigate or reprimand Wolf for the various incidents discussed under his hostile work environment claim.[53] But Hoover cannot show he was treated less favorably due to any alleged failure to investigate or reprimand because Jeide indicated that he "had never been asked to investigate any claims against Mr. Hoover for misconduct or provide advice of whether he should receive discipline for any workplace conduct."[54] He also stated that Hoover had never been the subject of any disciplinary action.

Also, outside the limitations period, Hoover complained of various incidents in which Wolf received accommodation.

In 2010, Hoover complained Wolf was given a bigger truck despite Hoover's requests for a larger truck and Wolf's accident history. But in his declaration, Long contended Hoover and Wolf alternated the use of the larger truck for many years, so they would switch back and forth depending on who was staying at Cedar Hill. Also in 2011, Hoover claimed Wolf improperly left an asbestos sample on his

---

[53] Hoover's response to summary judgment cites (1) the 2001 incident in which Badger told Hoover that Wolf might be afraid of him because "you are a big burly guy . . . and you're a black guy too," CP at 1004; (2) the 2004 or 2006 incident in which Wolf sat on Hoover's lap during a meeting; (3) the 2008 incident in which Badger recorded a conversation between herself and Hoover; (4) Wolf's 2010 comments concerning slavery; (5) the 2011 compactor accident; and (6) Wolf's unspecified 2011 comment referring to Hoover as her "little house boy." CP at 1005.

[54] CP at 342.

desk. When Hoover complained to Long, Long asked Wolf to take care of the sample the next day.

In 2012, Hoover complained SWD invested "approximately $2,000 on a truck bed pull-out in order to accommodate [Wolf's] complaints of back ache from loading and reaching into the deep bed . . yet SWD refused to accommodate Mr. Hoover's legitimate need for a bigger vehicle despite his repeated requests."[55] Hoover also claimed his coworkers mocked him when they saw him getting out of the smaller truck.

In his declaration, Jeide claimed that after investigating "the alleged failure to assign the larger of the two screener trucks to Mr. Hoover, . . . the evidence simply did not support his claim that his needs were ignored."[56] When Badger found out Hoover wanted the larger truck, she agreed to assign Hoover the larger truck. In an e-mail with Hoover in September 2012, Badger claimed, "[I]f I had any idea that this issue was such a sore point with you I would have switched the vehicles before today."[57]

Also in 2013, Hoover complained to Badger about Wolf's failure to empty the sharps container while at her assigned transfer station. Hoover said, "I know I will have to take care of it this time AGAIN."[58] In response, Badger told Hoover not to empty the sharps container. She also told Long that Wolf needed to pick up the sharps. Badger informed Hoover about the resolution of his complaint.

---

[55] CP at 655.

[56] CP at 347.

[57] CP at 76.

[58] CP at 79.

Hoover relied on three incidents within the limitations period. First, the November 2013 clamshell incident and his allegation that Wolf had the clamshell moved for her convenience. But, as previously discussed, the transfer station coordinator, Momon, was aware of and approved of Wolf's request to move the clamshell. Hoover does not provide evidence that he made a similar request.

Second, in August 2014, Hoover complained to Long that he was required to visit the furthest transfer sites while Wolf was assigned to the closer sites. Hoover claimed that after he reported the situation to Long, he was "never provided with an explanation."[59]

Third, in 2016, Hoover complained to management that he was forced to pick up Wolf's trash. He claimed that Long told Hoover to "suck it up and just do it."[60] When he reported the incident to Badger, she told Hoover, "[T]hat's what it takes."[61]

With regard to the incidents within the statute of limitations, Hoover fails to show any of the incidents were related to his race. As with his hostile work environment claim, Hoover fails to provide more than his subjective belief that the incidents were related to race. And because the incidents within the limitations period are discrete from any prior discriminatory conduct, Hoover cannot defeat the statute of limitations. Hoover also fails to show a sufficiently adverse employment action beyond inconvenience.

---

[59] CP at 656.

[60] Id.

[61] Id.

Hoover also contends he suffered disparate treatment because King County failed to promote him on several occasions.

In his declaration, Jeide indicated that it is the SWD's policy to "instruct our hiring panels that they are not to consider information about candidates that they know because they have worked with a candidate."[62] It is SWD's goal to "keep the process as fair as it can be, so that people are judged on the same criterion."[63]

In 2010, Hoover applied for the position of landfill gas operator. Hoover was not granted an interview. Out of the four finalists, SWD selected the applicant with the second highest score. One of the interviewers recommended the second highest scoring applicant be hired for the position because he "would be the best fit for the Landfill team."[64] Hoover argues this is evidence SWD "did not strictly limit their selection of the final candidate to the interview scores."[65]

In 2014, Hoover applied for a supervisor ride-along position. Hoover was not selected for an interview. "Mr. Hoover believes that he was not chosen for the job because if he had been selected for the position, his position would have been difficult to replace due to Peggy."[66]

Also in 2014, Hoover was denied a temporary special duty assignment as an abandoned junk vehicle Investigator. The position was offered to the second highest scoring applicant. Hoover was the fourth highest scoring applicant out of

---

[62] CP at 344.

[63] Id.

[64] CP at 982.

[65] Id.

[66] CP at 982-83.

the eight applicants. "Mr. Hoover was later told by Long that the real reason why he was not chosen for the position was because 'nobody wanted to work with Peggy.'"[67] In her declaration, Badger, one of panelists, indicated she "did not think Mr. Hoover's interview went as well as some of the others. He did not answer the questions as completely as he could have and failed to provide much detail in his answers."[68]

Also in 2014, Hoover applied for a supervisor position. According to Jeide, "Hoover was not considered because he submitted his application after the submission deadline."[69] The successful applications were Kerwin Pyle, Caucasian, and Anthony Slaughter, African-American. When it was discovered that Hoover's application was misdirected to a different position, the offers were retracted, and Hoover was granted an interview. During the interview, Hoover removed himself due to what he claimed was a hostile line of questioning from one of the panelists. After further interviews, the panel still recommended Pyle and Slaughter.

After the interview, Hoover overheard Badger mention that he "did not get the job, even though he was well qualified because the department would be severely inconvenienced by having to find a replacement for him due to the fact that nobody else wanted to work with Peggy."[70] One of the panelists found Hoover's interview "unremarkable" because he "has a tendency to respond to

---

[67] CP at 983.

[68] CP at 57.

[69] CP at 343.

[70] CP at 984.

questions in a very short and somewhat incomplete way."[71] Another panelist stated Hoover "did not interview well" and indicated that his demeanor was very casual, "which made him seem like he was not very engaged in the conversation."[72]

In 2015, Hoover applied for a permanent position as an abandoned junk vehicle inspector. He claims his score was miscalculated, and he should have been the second highest scoring applicant. The position was offered to the highest scoring applicant based on her interview and certification to inspect junk vehicles. Hoover also possessed a junk vehicle certification but "he did not list that fact in his application materials."[73]

The evidence provided by Hoover concerning disparate treatment related to hiring and promotions does not establish he suffered adverse employment actions based on race. King County had valid justifications for not promoting Hoover for the various positions to which he applied.[74]

For the 2010 landfill gas operator, the 2014 temporary abandoned junk vehicle inspector, and the 2015 permanent abandoned junk vehicle inspector positions, the winning applicants scored higher than Hoover. With regard to the 2014 supervisor position, because one of the successful applicants was African-American, Hoover cannot show King County's failure to hire him for that position

---

[71] CP at 413.

[72] CP at 416.

[73] CP at 1283.

[74] See Blackburn, 186 Wn.2d at 258 ("When an employee makes out a claim of disparate treatment under the WLAD . . . the employer's action is unlawful unless the employer has a *valid* justification." (emphasis added)).

was the result of disparate treatment due to race. As for the 2014 supervisor ride-along position, Hoover's subjective belief that he did not receive an interview because he would have been too difficult to replace is not enough to satisfy his burden of proof.

We conclude the trial court did not err in granting King County's motion for summary judgment and dismissing Hoover's claim of disparate treatment.

## II. Exclusion of Evidence

Hoover argues the trial court improperly struck certain evidence.

We review a trial court's decision to admit or exclude evidence made in conjunction with a motion for summary judgment de novo.[75]

### A. Lack of Foundation

First, Hoover challenges the court's exclusion of photographs for lack of foundation.

Under ER 901, authentication is a "condition precedent to admissibility." To lay a proper foundation for photographs, "it is only required that some witness, not necessarily the photographer, be able to give some indication as to when, where, and under what circumstances the photograph was taken, and that the photograph accurately portrays the subject illustrated."[76]

When opposing summary judgment, Hoover proffered a series of photographs. Some of the photos show stuffed animal monkeys tied to trees and cars. One photo shows a sticker that reads "TIRE PLANTATION MOBILE

---

[75] Wilkinson v. Chiwawa Communities Ass'n, 180 Wn.2d 241, 249, 327 P.3d 614 (2014).

[76] State v. Newman, 4 Wn. App. 588, 593, 484 P.2d 473 (1971).

ALABAMA."[77] And another photo shows a shirt and hat on a stick figure made of tree branches.[78] Hoover claimed these photos were taken throughout King County and the SWD. When the photos were offered, King County sought to depose Hoover concerning these photographs.[79] Hoover refused. As a result, King County moved to strike the photographs. The court ruled,

> For purposes of the motion for summary judgment, the Court did not consider the photographs marked as exhibit G to Mr. Hoover's declaration. Plaintiff failed to establish sufficient foundation for the photos including the approximate date, location, and to specify what was depicted. Plaintiff also failed to timely supplement this information in discovery and to make himself available to be deposed on the withheld discovery.[80]

Because Hoover failed to indicate when, where, and under what circumstances the photographs were taken, the trial court did not err in excluding these photographs for lack of foundation.

Hoover also argues the trial court failed to consider the factors from <u>Burnet v. Spokane Ambulance</u>[81] before it excluded the photographs. The court is required to conduct a <u>Burnet</u> analysis before excluding evidence due to a discovery violation.[82] But even if the photographs were excluded in part because they were

---

[77] CP at 1392.

[78] CP at 1393.

[79] "The items attached to Mr. Hoover's deposition and marked as Exhibits E, F and G were requested in discovery and should have been provided long before Mr. Hoover's summary judgment opposition and prior to his deposition. I anticipate that it will take less than two hours to complete this deposition and would hope it can be done in one hour; but that would depend on Mr. Hoover's responses." CP at 1384.

[80] CP at 1407.

[81] 131 Wn.2d 484, 933 P.2d 1036 (1997).

[82] <u>Id.</u> at 494.

late disclosed, Hoover still failed to lay the proper foundation for admissibility. The lack of foundation renders the photographs inadmissible regardless of the outcome of a missing Burnet analysis.

We conclude the trial court did not err in striking the photographs.

B. Hearsay

Second, Hoover challenges the court's exclusion of hearsay evidence. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."[83]

Hoover claimed Punch Martinez, an SWD employee, told Hoover that he overheard Voelker use an extremely offensive racial slur to refer to Hoover. Martinez is deceased and unable to testify. Hoover did not personally overhear Voelker's comment.

The court struck the statement because Hoover "failed to provide any legal authority in its opposition brief or at the May 15, 2017 hearing that would allow the Court to consider this hearsay remark."[84]

Hoover argues Voelker's statement is not hearsay because he did not offer the statement to prove the truth of the matter asserted. But Martinez's statement that he overheard Voelker is offered to prove the truth of the matter asserted, that he did in fact overhear Voelker. Although a statement is not hearsay if it is offered only to show it was made,[85] Hoover still fails to provide reasoning to support the

---

[83] ER 801.

[84] CP at 1407.

[85] State v. Gonzalez-Hernandez, 122 Wn. App. 53, 57, 92 P.3d 789 (2004).

admission of Martinez's statement to Hoover about Voelker's use of the extremely offensive racial slur.

We conclude the trial court did not err in striking Voelker's statement. Therefore, we affirm.

WE CONCUR:

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON
2018 SEP 24 AM 9: 11