IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| BENJAMIN DANIELSON, | No. 87793-3-I |
| Respondent, | |
| v. | DIVISION ONE |
| SEATTLE CHILDREN'S HOSPITAL, a Washington nonprofit corporation | UNPUBLISHED OPINION |
| Appellant. | |

DÍAZ, J. — Dr. Benjamin Danielson sued Seattle Children's Hospital (the hospital) under the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW. Danielson claimed that, during the 21 years he was employed as the medical director of the hospital's Odessa Brown Children's Clinic (OBCC), he was subjected to a hostile work environment due to his race. He also claimed that he experienced retaliation for opposing such racism and for calling attention to the hospital's "continuing refusal to take meaningful steps" to address the racism. The jury awarded Danielson $21 million in damages. The hospital challenges both the verdict and the amount of damages. We affirm.

## I.    BACKGROUND

Danielson was employed from 1999 to 2020 as the medical director of the OBCC, a satellite clinic of Seattle Children's Hospital.  OBCC largely served African American patients.  Danielson, an African American doctor, testified at trial that other hospital employees doubted his intelligence and competence in his role and that, for the full 21 years, he was not "welcome" in the professional space.

More overtly, other witnesses testified that the president of an affiliated research institute, Jim Hendricks, referred to Danielson using an egregious racial slur, and that the hospital did not address the slur even after it was reported to the president of the Seattle Children's Foundation and the hospital's Chief Executive Officer (CEO).

Danielson also testified about systemic racism that impacted both employees and patients in the hospital.  At a meeting of the board of directors in 2019, Danielson expressed concerns that the hospital was not prioritizing funding that would serve the African American community.  In 2020, Danielson was investigated for a HIPAA violation, and then for other alleged issues with his leadership.  The investigation found that some allegations of misconduct were at least partially substantiated.  They planned to conduct a "360 review[1] of [his] leadership" and require Danielson to work with a leadership coach.  Danielson believed this was a retaliation for what he had said at the board meeting.  He resigned from his position at the hospital.

---

[1] A "360 review" is a professional development tool intended to provide those in leadership positions with feedback from multiple sources.

After Danielson resigned, the hospital hired the law firm Covington and Burling to complete an investigation and assessment of racial equity in the hospital. The firm produced a report (the Covington report) which included both findings and recommendations. Among other findings, the report stated that the hospital indeed had not adequately investigated the allegation that Danielson was called by a racial slur, and that the hospital work environment "excludes and undervalues BIPOC workforce members."

Danielson sued the hospital under WLAD, claiming both a hostile work environment and retaliation. The hospital moved for summary judgment, which the court denied. After a 16-day trial, the jury returned a ten-to-two verdict of $21 million for Danielson. The court then denied the hospital's motions for judgment as a matter of law, for a new trial, and for remittitur. The hospital timely appeals.

## II. ANALYSIS

WLAD makes it unlawful for an employer to discriminate against an employee because of race. RCW 49.60.180(3). RCW 49.60.030(2) allows an employee subjected to discrimination to bring a civil action against their employer. WLAD is to be "construed liberally to effectuate its purpose of remedying discrimination." Gibson v. Costco Wholesale, Inc., 17 Wn. App. 2d 543, 556, 488 P.3d 869 (2021) (citing Clipse v. Commercial Driver Servs., Inc., 189 Wn. App. 776, 790, 358 P.3d 464 (2015)).

### A. Hostile Work Environment

The hospital makes various arguments in support of reversal of the jury verdict finding a hostile work environment. First, it claims that the trial court erred

when it denied its motions for summary judgment, directed verdict, and judgment as a matter of law. Second, the hospital claims that the court abused its discretion when it admitted evidence of the racial slur and did not give a limiting instruction regarding the findings of the Covington report. Third, the hospital argues that the court gave an improper jury instruction. We hold that the court did not err in any of these respects and that substantial evidence supports the jury's verdict. We address each argument in turn.

    1. Substantial Evidence

We first address the appropriate standard of review. The hospital argues that this court should review de novo the denial of its motions for summary judgment and judgment as a matter of law. We disagree and review the verdict for substantial evidence.

"'A summary judgment denial cannot be appealed following a trial if the denial was based upon a determination that material facts are disputed and must be resolved by the factfinder.'" Kaplan v. Nw. Mut. Life Ins. Co., 115 Wn. App. 791, 799, 65 P.3d 16 (2003) (quoting Brothers v. Pub. Sch. Employees of Wash., 88 Wn. App. 398, 409, 945 P.2d 208 (1997)). The losing party must then appeal the sufficiency of the evidence. Winbun v. Moore, 143 Wn.2d 206, 213, 18 P.3d 576 (2001). "'The record must contain a sufficient quantity of evidence to persuade a rational, fair-minded person of the truth of the premise in question.'" Id. (quoting Canron v. Fed. Ins. Co., 82 Wn. App. 480, 486, 918 P.2d 937 (1996)).

The reviewing court should overturn a jury verdict only if it is clearly unsupported by substantial evidence. Gorman v. Pierce County, 176 Wn. App. 63,

87, 307 P.3d 795 (2013). Substantial evidence is "evidence that, if believed, would support the verdict." Id. The jury's role is to consider the evidence and draw inferences from it. Burnside v. Simpson Paper Co., 123 Wn.2d 93, 108, 864 P.2d 937 (1994). "We cannot substitute our judgment for that of the jury." Gorman, 176 Wn. App. at 87. Since the jury found that Danielson had met his burden based on the evidence, we should review for substantial evidence instead of de novo review. Winbun, 143 Wn.2d at 213.

The hospital claims that Danielson's hostile work environment claim fails because Danielson "presented no evidence of racially-motivated workplace harassment." By way of summary only, we hold that, at a minimum, Danielson's testimony—that (a) hospital staff doubted his competence due to his race and (b) the hospital did not adequately address a racial slur directly aimed at Danielson— alone or together could persuade a rational juror that Danielson was subjected to a hostile work environment. Winbun, 143 Wn.2d at 213. A juror could reasonably conclude from the totality of those circumstances that Danielson experienced harassment that affected the conditions of his employment. Blackburn v. Dep't of Social & Health Servs., 186 Wn.2d 250, 260, 375 P.3d 1076 (2016). Those two pieces of evidence alone or together are substantial evidence to support the jury's verdict.

"An employee must demonstrate four elements for a hostile work environment claim: that the harassment (1) was unwelcome, (2) was because of a protected characteristic, (3) affected the terms or conditions of employment, and (4) is imputable to the employer." Id. at 260 (citing Glasgow v. Ga.-Pac. Corp.,

5

103 Wn.2d 401, 406-07, 693 P.2d 708 (1985)). The hospital claims that Danielson failed to demonstrate harassment that affected the terms or conditions of employment.

Whether the conduct affected the "terms and conditions of employment" is generally a question of fact for the jury to determine by examining the "totality of the circumstances." Davis v. Fred's Appliance, Inc., 171 Wn. App. 348, 362, 287 P.3d 51 (2012).

Danielson argued that he experienced a hostile work environment because hospital staff questioned his competence due to his race. He testified that people "didn't think [he] was very smart . . . were amazed that [he]'d have the right answer, or thought [he] was somehow cheating[.]" He testified that for 21 years, he was "either considered too loud or too quiet" and that he felt he was "a person not welcome in the space that [he] really felt was [his] professional home." He specifically stated that, when Jeff Sperring became CEO in 2015, he subjected Danielson to discriminatory behavior until Danielson resigned.[2]

Over the hospital's objection, discussed below, Danielson presented evidence that in 2007, Dr. Hendricks called Danielson the N-word when talking to another employee. The employee reported the incident to the president of the Seattle Children's Foundation, Doug Picha, and then to human resources. The report was passed on to Tom Hansen, the CEO at the time. The employee also

---

[2] The hospital did not challenge any of this testimony as being conclusory or vague at trial or on appeal. The only testimony that the hospital argued is conclusory is Danielson's testimony of the racist treatment he experienced during his residency, which we do not rely on as substantial evidence to support Danielson's hostile work environment claim.

eventually told Danielson himself, who brought it up with the hospital medical director, David Fisher. Fisher changed the subject and did not address the issue. Dr. Hendricks continued to work at the hospital until the end of 2020.

The hospital argues that the three-year statute of limitations bars the racial slur from forming the basis for a hostile work environment.[3] But for a hostile work environment claim, as long as one event "occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." Antonius v. King County, 153 Wn.2d 256, 264, 103 P.3d 729 (2004) (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002)). A hostile work environment "'occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own . . . Such claims are based on the cumulative effect of individual acts.'" Id. (alteration in original) (quoting Morgan, 536 U.S. at 115).

The hospital in response argues that Danielson did not show that the racial slur was part of the same hostile work environment because he failed to present "specific material facts showing similarly offensive language or conduct after July 17, 2020." (Emphasis omitted.) They claim that, because Danielson admitted that he had no knowledge that anyone else had "ever used racially discriminatory language about him," he lacked evidence that any hostile work environment continued into 2020.

---

[3] Although the hospital disputed Hendricks's use of the slur at trial, it concedes that following the jury's verdict, the reviewing court presumes that Hendricks did in fact use the slur to refer to Danielson.

But "[t]he standard for linking discriminatory acts together in the hostile work environment context is not high." Loeffelholz v. Univ. of Wash., 175 Wn.2d 264, 276, 285 P.3d 854 (2012). Danielson need not present evidence, as the hospital claimed at oral argument, of a specific slur was directed at him within the statute of limitations. Wash. Ct. of Appeals oral argument, Danielson v. Seattle Children's Hospital, No. 87793-3-I (April 10, 2026), at 4 min., 45 sec. through 4 min., 59 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2026041013/?eventID=2026041013.

In Antonius, our Supreme Court rejected the continuing violation doctrine, which required a "substantial relationship between the timely and untimely conduct[.]" 153 Wn.2d at 262. The court held instead that "some relationship" is required between acts constituting the same hostile work environment. Id. at 271.

The jury was correctly instructed that they may "consider conduct occurring prior to July 17, 2020, only if it is part of the same hostile work environment as at least one act that took place after July 17, 2020." See Morgan, 536 U.S. at 115 ("Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."). We hold that it was the jury's role to determine whether the racial slur in 2007 was part of a hostile work environment that continued until 2020. See Loeffelholz, 175 Wn.2d at 276–77 ("a reasonable juror could infer from these events that the 'angry man' comment was a natural extension of the conduct that made up the preamendment oppressive work

8

environment."). It is the reviewing court's role to review such an inference for substantial evidence. See Burnside, 123 Wn.2d at 107-08.

The hospital claimed at oral argument that "there is absolutely no suggestion that Dr. Danielson was being considered any differently by any of his colleagues within the statute of limitations." Wash. Ct. of Appeals oral argument, supra at 5 min., 40 sec. through 5 min., 59 sec. We disagree. Danielson testified that "throughout" his employment, he was "both criticized for saying too much and saying too little" due to his race. He testified that "[t]here was never a time, during [his] entire twenty-one-year tenure at—at OBCC as medical director, where [he] believed that a hostile work environment did not exist." He also testified that he heard the CEO "talk glowingly" about Dr. Hendricks even after Hendricks' use of the racial slur was reported and supposedly investigated. He testified that "starting from 2015 forward, [he] believed that Dr. Jeff Sperring subjected [him] to discriminatory behavior."

Taken in the context of the hospital's choice to ignore a racial slur, a reasonable juror could infer that the later discrimination Danielson described was a "natural extension of the conduct that made up the . . . oppressive work environment" that existed prior to July 2020. See Loeffelholz, 175 Wn.2d at 276.

At oral argument, the hospital attempted to factually distinguish Loeffelholz. Wash. Ct. of Appeals oral argument, supra at 18 min., 40 sec. through 20 min., 15 sec. It points out that Loeffelholz was denied overtime and training opportunities, a specific harm due to her sexual orientation. Loeffelholz, 175 Wn.2d at 268.

But a racial slur is also specific harm which, as the hospital conceded at

9

oral argument, could serve as a basis for liability due to a hostile work environment. Wash. Ct. of Appeals oral argument, supra at 1 min., 35 sec. through 1 min., 47 sec. Our Supreme Court held in Loeffelholz that, even though the specific harm occurred before the period of liability, it was part of the same hostile work environment as her supervisor's comment that he would become an "angry man." 175 Wn.2d at 276–77. We similarly hold that even though the racial slur occurred outside the statute of limitations, it occurred within the same hostile work environment as the racial discrimination that Danielson experienced until he resigned.

The hospital argues in a Statement of Additional Authorities that, if we were to allow Danielson to rely on the racial slur as evidence of a hostile work environment, we would "abolish" the statute of limitations for such claims. But our Supreme Court dismissed that argument in Antonius, when it rejected the substantial relationship requirement "[i[n light of the rule of liberal construction and the purposes of the law prohibiting . . . discrimination." 153 Wn.2d at 270.

The hospital next claims that Crownover v. Dep't of Transp., 165 Wn. App. 131, 143, 265 P.3d 971 (2011), supports its argument that Danielson fails to show "similarly offensive language or conduct" in order to present evidence of the racial slur to the jury. We disagree. In Crownover, this court affirmed summary judgment dismissal because the plaintiff had sought to use unrelated "retaliatory conduct" to anchor in gender discrimination that occurred before the statute of limitations. Id. Danielson does not rely on retaliatory conduct to establish a hostile work environment. He instead presented evidence that the employee who called

10

Danielson a racial slur continued to be praised by the CEO, and that the same CEO also treated Danielson differently because of his race.

The hospital also claims that Crownover supports its argument that an act too remote in time, such as the racial slur in this case, cannot serve as evidence of a hostile work environment. But the court in Crownover held that "[a]cts that are 'so discrete in time or circumstances' . . . do not constitute a single hostile work environment." 165 Wn. App. at 144 (internal quotation marks omitted) (quoting Lucas v. Chi. Transit Auth., 367 F.3d 714, 727 (7th Cir. 2004)). But Danielson did not present evidence of the racial slur is as a "discrete" event. Danielson presented the racial slur as evidence of discrimination that lasted for his entire employment.

Examining the totality of the circumstances, the evidence in this case could "persuade a rational, fair-minded person" that Danielson was subjected to a hostile work environment. Winbun, 143 Wn.2d at 213 (internal quotation marks omitted).

Finally, the hospital cites Scaife v. U.S. Dep't of Veterans Affairs, 49 F.4th 1109, 1117 (7th Cir. 2022), in which the Seventh Circuit affirmed a dismissal of the hostile work environment claim when a supervisor used a racial slur one time outside the employee's presence. Although the hospital claims that Scaife supports their argument that "a single racial slur that the plaintiff did not personally experience cannot create a hostile work environment," the Seventh Circuit acknowledged that a one-time use of an epithet could in some circumstances warrant liability. 49 F.4th at 1116. Unlike Danielson, who testified that he experienced discrimination and implicit bias from other employees of the hospital, the employee in Scaife relied on the racial slur as the only evidence of a hostile

11

work environment based on race. Id. The case also states that "racial epithets do not always have to be stated directly to a plaintiff to create an objectively hostile work environment[.]" Id. We therefore decline to weigh the totality of the circumstances, deferring instead to the jury's determination.

In addition to his individual experience, Danielson also presented evidence of systemic racism affecting both patients and employees of the hospital. Supervisors gave employees of color "across the board" lower performance reviews than their white peers. The OBCC building itself was not maintained as well as the hospital's main building. Unlike other clinics, OBCC had to rely on donations for funding. The hospital used a "Code Purple" to call security disproportionately on Black families. Hospital staff mistreated children with sickle cell anemia, labeling them as "drug seeking." Danielson testified that he experienced "secondary trauma" from witnessing the racist treatment of "people with [his] background."

Danielson argues that the unaddressed systemic racism is additional evidence of a hostile work environment. The hospital responds that evidence of "[s]ystemic implicit bias", "failure to fully eliminate institutional racial disparities", or "racially motivated" funding decisions, cannot be evidence of a hostile work environment because they are not evidence of individual harm or harassment.

But, because Danielson provides substantial evidence of a hostile work environment by describing how employees treated him individually, we may affirm based on said evidence. Truck Ins. Exch. v. Vanport Homes, Inc., 147 Wn.2d 751, 766, 58 P.3d 276 (2002) ("We may affirm the trial court on any grounds established

12

by the pleadings and supported by the record."). "'Principles of judicial restraint dictate that if resolution of an issue effectively disposes of a case, we should resolve the case on that basis without reaching any other issues that might be presented.'" Wash. State Farm Bureau Fed'n v. Gregoire, 162 Wn.2d 284, 307, 174 P.3d 1142 (2007) (internal quotation marks omitted) (quoting Hayden v. Mut. of Enumclaw Ins. Co., 141 Wn.2d 55, 68, 1 P.3d 1167 (2000)). Thus, we need not and do not address whether evidence of racial disparities, implicit bias, and systemic inequity that were not directed at Danielson individually are evidence of a hostile work environment.

### 2. Evidentiary Rulings

The hospital assigns error to two of the trial court's evidentiary rulings. We review evidentiary rulings for an abuse of discretion. Helmbreck v. McPhee, 15 Wn. App. 2d 41, 55, 476 P.3d 589 (2020).

The hospital argues that the court abused its discretion under ER 403 when it admitted evidence of the racial slur that occurred before the three-year WLAD statute of limitations.

Relevant evidence should be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]" ER 403. We give great deference to the trial court's "balancing of probative value against prejudicial effect" in ER 403 rulings. Degroot v. Berkley Constr., Inc., 83 Wn. App. 125, 128, 920 P.2d 619 (1996).

Since racism is the central issue to this case, the racial slur has high probative value. The hospital argues that it is too remote in time to be relevant,

but as we addressed supra, as long as one event "occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." Antonius, 153 Wn.2d at 264 (quoting Morgan, 536 U.S. at 117). Since we hold that the slur is a part of the same hostile work environment that continued until Danielson resigned in 2020, the slur is relevant to the hostile work environment claim.

It is true that racial slurs can be highly prejudicial, but, given the nature of this case, the slur has high probative value and it is not an abuse of discretion to find that it was not "unfair" prejudice to hold leadership to the words it chooses to use. Thus, we hold that the court did not abuse its discretion in admitting it as evidence of a hostile work environment. Degroot, 83 Wn. App. at 128.

The hospital next argues that the court erred when it declined to give a limiting instruction regarding the jury's consideration of the Covington report. We again find no abuse of discretion.

The Covington report included a finding that the hospital did not "adequately investigate or address" the allegation of Dr. Hendricks referring to Danielson with a racial slur. The hospital moved to exclude the Covington report from evidence under ER 407. The court denied the motion. The hospital then asked the court to provide a limiting instruction clarifying report should not be considered as proof of culpability. The court again denied the motion.

The hospital argues that the court should have instructed the jury that the Covington report "could not be considered as evidence of culpable conduct." It claims that the Covington report was a remedial measure and therefore cannot be

used as evidence of liability under ER 407.

"When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event." ER 407. But ER 407 does not protect reports or investigations into what went wrong.[4] See Rocky Mountain Helicopters, Inc. v. Bell Helicopters Textron, 805 F.2d 907, 918 (10th Cir. 1986)) ("It would strain the spirit of the remedial measure prohibition in Rule 407 to extend its shield to evidence contained in post-event tests or reports . . . such tests are conducted for the purpose of investigating the occurrence to discover what might have gone wrong or right."). The protected remedial measures would be "actions taken to remedy any flaws or failures indicated by the" report. Id.

The hospital argues that "[c]ourts diverge from Rocky Mountain when, as here, post-event tests or studies serve both investigatory and remedial ends."[5] Although the Covington report did include both findings and recommendations,

---

[4] See also CLIFFORD S. FISHMAN & ANNE TOOMEY MCKENNA, JONES ON EVIDENCE § 21:13 (7th ed. Nov. 2025) (stating that "most courts have interpreted Fed. R. Evid. 407 and state equivalents as excluding only evidence of the actual implementation of a safety improvement, but not the reports or memoranda that lead up to the improvements"; noting that "[a] careful reading of the rule . . . supports this interpretation: To be excluded under the rule, the measure at issue must be one that could have been taken before the event that gave rise to the claim. One cannot investigate an accident before it occurs, so an investigation and report of the cause of an accident, . . . cannot be a measure that is excluded from evidence under the rule" (some alterations in original) (internal quotation marks omitted)).

[5] The Tenth Circuit recently declined to diverge from Rocky Mountain in Packard v. City of Denver, No. 24-1367, 2026 WL 1077632 (10th Cir. Apr. 21, 2026), holding that testimony of investigation into police response to protests was not barred by ER 407 even though the investigation conclusions included "implied" recommendations.

15

there is no evidence that the finding regarding the inadequate investigation of the racial slur served any remedial end. We hold that the findings and recommendations in the Covington report are not evidence that the hospital has actually taken remedial measures to address the hostile work environment that Danielson describes. The court therefore did not abuse its discretion in declining to provide a limiting instruction.

3. Jury Instructions

The hospital argues that the court erred when it replaced the word "harassment" in the jury instructions with the words "hostile work environment" because it removed Danielson's burden to establish harassment. We disagree.

The parties initially agreed to jury instructions that exactly followed 6A WASH. PRAC., WASH. PATTERN JURY INSTR. CIV. WPI 330.21 at 345 (7th ed. 2022) (WPI). That night over email, Danielson asked to replace the word "harassment" used in the WPI, with "hostile work environment," which he argued would be less confusing to the jury. The court agreed and revised the jury instructions over the hospital's objection.

"Jury instructions are generally sufficient if they are supported by the evidence, allow each party to argue its theory of the case, and, when read as a whole, properly inform the trier of fact of the applicable law." Helmbreck, 15 Wn. App. 2d at 57. We review de novo whether a jury instruction correctly states the law. Taylor v. Intuitive Surgical, Inc., 187 Wn.2d 743, 767, 389 P.3d 517 (2017). A misleading instruction does not require reversal without proof the instruction was prejudicial. Keller v. City of Spokane, 146 Wn.2d 237, 249, 44 P.3d 845 (2002). It

is the party challenging an instruction that bears the burden of establishing prejudice. Griffin v. W. RS, Inc., 143 Wn.2d 81, 91, 18 P.3d 558 (2001).

The relevant WPI on employment discrimination reads, "*Harassment* on the basis of [(describe protected status)] is unlawful [employment] discrimination." WPI 330.21 at 345 (emphasis added). The pattern jury instruction on a hostile work environment reads, in part, "To establish [his] [her] claim of *harassment* on the basis of [(describe protected status)], (name of plaintiff) has the burden of proving each of the following propositions: (1) That there was language or conduct concerning [(describe the language or conduct related to protected status)]; . . . (3) That this conduct or language was so offensive or pervasive that it altered the conditions of (name of plaintiff)'s employment." WPI 330.23 at 350 (emphasis added).

Here, the language describing the elements that Danielson would need to prove to meet his burden remained unchanged. The amended jury instructions therefore correctly stated the law and placed the correct burden on Danielson, even if they do not exactly match the WPI.

The hospital was able to argue its case that Danielson had failed to present evidence "proving that . . . [racism] altered the conditions of his employment." The hospital does not show that the jury instructions prejudiced its ability to present its case. Griffin, 143 Wn.2d at 91. Since the jury instructions informed the jury of the applicable law and allowed each party to argue its case theory, we find no error in the challenged jury instructions. Helmbreck, 15 Wn. App. 2d at 57.

The hospital further argues that the court "exacerbated its error" when it

17

declined to provide the hospital's proposed clarifying instruction to the jury. We disagree.

During deliberations, the jury asked, "What does the term conditions of employment mean?"[6] The hospital proposed offering the following clarifying language: "Conduct affects the terms or conditions of employment i[f] it is sufficiently pervasive to alter the conditions of employment and create an abusive work environment. Whether conduct meets this test depends on the 'totality of the circumstances', including the frequency and severity of harassing conduct, whether it was physically threatening or humiliating or merely an offensive utterance, and whether it unreasonably interfered with the employee's work performance." This proposed clarification relied on the law as explained in Glasgow, 103 Wn.2d at 406-07.

The court declined to offer the hospital's proposed language, concerned that highlighting certain things for the jury to consider would be the court improperly commenting on the evidence. We hold that this ruling was not in error.

The hospital's proposed instruction did not define "conditions of employment," as the jury had requested. The instruction instead offered examples of evidence that the jury may consider. The court was correct to avoid instructing the jury to place more weight on certain evidence. See In re Det. of R.W., 98 Wn. App. 140, 144, 988 P.2d 1034 (1999) (holding that the trial court impermissibly

---

[6] The hospital claims that this question is evidence that removing "harassment" from the jury instructions confused the jury. We disagree. WPI 330.23 defines harassment as conduct or language "so offensive or pervasive that it altered the conditions of . . . employment." It is circular reasoning to conclude that the defining "conditions of employment" for the jury would require the word "harassment."

comments on the evidence if it "instructs the jury as to the weight that should be given certain evidence.").

Thus, each of the various challenges the hospital brings to Danielson's first cause of action fail.

B.      Retaliation

The hospital next claims that the court erred when it denied its motion for judgment as a matter of law on Danielson's claim of retaliation.  We disagree.

"When reviewing an order granting or denying a motion for judgment as a matter of law, this court applies the same standard as the trial court, determining whether, after viewing the evidence in the light most favorable to the nonmoving party, substantial evidence exists to support the verdict for the nonmoving party." Grove v. PeaceHealth St. Joseph Hosp., 182 Wn.2d 136, 143, 341 P.3d 261 (2014).

The hospital claims that "[n]o reasonable juror could find that Children's retaliated against Dr. Danielson by initiating an investigation six months after he spoke out regarding the Odessa Brown project at the September 2019 Board meeting."  We disagree and hold that the jury's finding of retaliation is supported by substantial evidence.

WLAD prohibits employers from "retaliating against employees who oppose discriminatory practices."  Cornwell v. Microsoft Corp., 192 Wn.2d 403, 411, 430 P.3d 229 (2018) (citing RCW 49.60.210(1)).  "To establish a prima facie case of retaliation, an employee must show three things: (1) the employee took a statutorily protected action, (2) the employee suffered an adverse employment action, and

(3) a causal link between the employee's protected activity and the adverse employment action." Id. at 411.

We hold that Danielson engaged in a protected action when he expressed the belief that the hospital was not keeping funding commitments to the African American community that the clinic served.[7] A statutorily protected action occurs if an employee opposes a practice that "he reasonably believed to be discriminatory." Alonso v. Qwest Commc'ns Co., LLC, 178 Wn. App. 734, 754, 315 P.3d 610 (2013). If the employee alleges racial discrimination, the practice or action must include some reference to race. See id.

Danielson testified at trial that, at a board meeting in September 2019, he expressed concern that the hospital was deprioritizing funding that would serve the African American community. Danielson's speaking up at the board meeting is a protected activity because Danielson "reasonably believed" that the hospital's budgeting decisions were discriminatory based on the race of the patients. Alonso, 178 Wn. App. at 754.

The hospital claims that Danielson failed to prove that he suffered an adverse employment action. We disagree. An adverse employment action is "[a] change in employment conditions . . . a demotion or an adverse transfer, or a hostile work environment." Id. at 746 (citation omitted). Whether an employee

---

[7] The hospital insists in their reply brief that they have not conceded that Danielson engaged in a "protected activity." But the hospital does not dispute that Danielson's expressions at the board meeting were a protected activity, either in their motion for summary judgment, their motion for judgment as a matter of law, or in their opening brief. Whether or not they concede the matter, it is not one in serious dispute.

suffered an adverse employment action is a question for the jury unless any reasonable juror could reach only one conclusion. See id. at 747 (holding that a transfer that caused an employee to lose a newer van and cell phone benefits could allow a reasonable juror to conclude the employee had suffered an adverse employment action).

In March 2020, the hospital initiated an investigation into Danielson's disclosure of the COVID status of some employees in violation of HIPAA. The hospital then expanded the investigation into whether Danielson treated employees differently based on race or gender.

In July 2020, the hospital informed Danielson that, based on the investigation findings, they recommended that Danielson participate in a "360 review of [his] leadership" and work with an executive leadership coach. Danielson testified that he knew from experience that the hospital used these tools to "push [employees] out." Danielson also testified that at the same time the hospital recommended the coaching, they demoted him from a director role to an advisory role. Danielson's testimony of the expanded investigation and demotion could lead a jury to conclude that Danielson suffered an adverse employment action.

In response, the hospital points to testimony that the 360 review and leadership coach were not a punishment and that the letter stating that Danielson's role was advisory was a clarification instead of demotion. Such evidence was for the jury to consider when they determine the factual question of whether Danielson suffered an adverse employment action. See Alonso, 178 Wn. App. at 747. This court should not substitute its judgment for that of the jury. Gorman, 176 Wn. App.

at 87.

The hospital next claims that Danielson did not present evidence of retaliatory animus or of a causal link between the protected activity and the alleged adverse employment action. We disagree.

The causal link for a retaliation claim is usually supported by circumstantial evidence, since an "'employer is not apt to announce retaliation as his motive.'" Cornwell, 192 Wn.2d at 411 (quoting Wilmot v. Kaiser Alum. & Chem., 118 Wn.2d 46, 69, 821 P.2d 18 (1991)).

Danielson believed that his demotion was "retaliation for . . . speaking up at a board meeting." In response, the hospital points to evidence that Danielson had been vocal about racial inequities in the healthcare system for several years before the incident at the board meeting, all without any alleged retaliation. They also point to Danielson's testimony that he was encouraged by leadership to speak candidly at the board meeting. Again, all of this evidence is for the jury, not this court, to weigh. Cornwell, 192 Wn.2d at 412-13 (holding that "to avoid summary judgment on causation, the employee must show only that a reasonable jury could find that retaliation was a substantial factor in the adverse employment decision."). But the circumstantial evidence that Danielson was demoted after he accused the hospital of racism in its budgeting decisions is substantial evidence supporting the jury's verdict. Gorman, 176 Wn. App. at 87.

To rebut the retaliation claim, the hospital points to Danielson's testimony that they were obligated to investigate allegations of Danielson's misconduct. But if the employer presents evidence of a "legitimate, nondiscriminatory reason for

the adverse employment action," the plaintiff need only present evidence that retaliation was a substantial factor. Scrivener v. Clark Coll., 181 Wn.2d 439, 446, 334 P.3d 541 (2014). Since an employer can be "motivated by multiple purposes," the employee does not need to disprove the "employer's articulated reasons" to meet the substantial factor burden. Id. at 447.

To show that retaliation could be a substantial factor, an employee may rely on evidence that the employer knew of the employee's protected action before the employee was subjected to the adverse employment action. Cornwell, 192 Wn.2d at 413. Danielson met his burden of production by testifying that within months of the board meeting, the hospital deployed tools to "push [him] out." This evidence would allow the jury to infer that retaliation was a substantial factor, even if the hospital also had legitimate reasons. Scrivener, 181 Wn.2d at 447. It was for the jury to weigh whether to believe Danielson's assertion.

Finally, the hospital relies on the unpublished case Smith v. City of Seattle, No. 84351-6-I, slip op. at 19 (Wash. Ct. App. Dec. 4, 2023) (unpublished), https://www.courts.wa.gov/opinions/pdf/843516.pdf, to argue that Danielson must show that the hospital "departed from its policies and procedures" when it investigated him. We hold that Danielson's testimony that the "investigation into whether or not [he] had disclosed personal information about Covid, was suddenly including all these other assessments of [himself]" is substantial evidence that the hospital's investigation had departed from its standard procedure.

The jury's role is to "determine the true reason for the action because the record contains reasonable but competing inferences of both discrimination and

23

nondiscrimination." Rice v. Offshore Sys., Inc., 167 Wn. App. 77, 90, 272 P.3d 865 (2012). It is not our role. Since a reasonable juror could infer that the employer's stated reasons were pretextual, the court was correct not to grant the motion for a directed verdict on the retaliation claim. See id. The court did not err in entering judgment based on the verdict.

## C.      Remittitur

Finally, the hospital argues that the court abused its discretion when it refused to remit the $21 million verdict. We disagree.

The court's statutory authority to remit a verdict is based in RCW 4.76.030, which states that, if the court finds the jury's damages award "to be so excessive or inadequate as unmistakably to indicate that the amount thereof must have been the result of passion or prejudice," the court may "order a new trial or may enter an order providing for a new trial unless the party adversely affected shall consent to a reduction or increase of such verdict."

"'An appellate court will not disturb an award of damages made by a jury unless it is outside the range of substantial evidence in the record, or shocks the conscience of the court, or appears to have been arrived at as the result of passion or prejudice.'" Bunch v. King County Dep't of Youth Servs., 155 Wn.2d 165, 175, 116 P.3d 381 (2005) (quoting Bingaman v. Grays Harbor Cmty. Hosp., 103 Wn.2d 831, 835, 699 P.2d 1230 (1985)). "A damages award 'shocks the conscience' if it is 'flagrantly outrageous and extravagant.'" Pendergrast v. Matichuk, 189 Wn. App. 854, 868, 355 P.3d 1210 (2015) (internal quotation marks omitted) (quoting Bunch, 155 Wn.2d at 179).

24

The trial court, having witnessed the testimony of emotional distress, is in the best position to determine whether the testimony supports the amount of damages. Hill v. GTE Directories Sales Corp., 71 Wn. App. 132, 140, 856 P.2d 746 (1993). We therefore review the trial court's refusal of remittitur for abuse of discretion. Bunch, 155 Wn.2d at 176.

In our republic, the jury is essential in determining the value of noneconomic damages, which is a question of fact. Id. at 179. There is a strong presumption in favor of a jury's award. Id. at 173. "[E]motionally laden testimony . . . regarding the emotional distress and mental anguish" is evidence supporting a large verdict of noneconomic damages. Wuth v. Lab. Corp. of Am., 189 Wn. App. 660, 704, 359 P.3d 841 (2015). A substantial length of time experiencing discrimination is also evidence in support of a large damages award. Bunch, 155 Wn.2d at 180 (holding that a six-year period of employment discrimination is substantial and supports a large award of noneconomic damages).

Danielson sought only noneconomic damages for "emotional distress, anxiety, humiliation, and embarrassment[.]" At closing argument, he suggested "a range of $15 to $20 million" for the damage that he experienced "over 21 years."

Substantial evidence supports the jury's award. Danielson worked for 21 years in what the jury determined to be a hostile work environment. He testified at trial that the hospital had caused "great mental strain, changes in the way [his] heart functions, and changes in the way [he] eat[s] and sleep[s]." He also testified that he had stopped practicing medicine because the "personal wound" affected his "sense of [his] capacity" to work with the patients. This testimony is substantial

evidence supporting the verdict. The amount is not flagrantly outrageous considering the length of time in the hostile work environment. See id.

For the court to disturb the jury award despite substantial evidence, the record must "unmistakably indicate[] that the verdict is not actually based on that substantial evidence but instead on some improper consideration that gives rise to passion or prejudice, or that otherwise shocks the court's conscience." Coogan v. Borg-Warner Morse Tec Inc., 197 Wn.2d 790, 814, 490 P.3d 200 (2021).

The hospital claims that the verdict was based on the alleged errors addressed supra. Since we find no error on review, no alleged error was the improper basis for passion or prejudice.

The hospital also argues that Danielson incited passion and prejudice when the court improperly allowed him to "tell the jury that [the hospital] should be 'held to account' for systemic racism[.]" We read no improper comment in the record.

The hospital argues that in Danielson's closing argument, he invited the jury to make "a greater impact" on systemic racism, as opposed to holding the hospital accountable for the harassment that Danielson personally experienced. But in context, Danielson invited the jury to hold "Seattle Children's Hospital, as an institution, accountable for this harm and for their inaction and their action *that has profoundly harmed Ben Danielson*." (Emphasis added.)

The hospital makes a similar argument about a comment in Danielson's closing rebuttal, in which he stated that if the jury did not hold the hospital accountable, "racism will continue to be alive and well." Again, in context, the comment is not improper. Danielson argued:

> "[Y]ou're the ones who will decide if Seattle Children[']s is going to be held to account. Money does not fix racism . . . But if you let those facts cause you to bring an award back that is insufficient to account *for the damage that Dr. Danielson has dealt with over 21 years at OBCC*, 21 years—if your verdict does not bring accountability for what Seattle Children[']s did, what they knew, what they should have known, what they did, and what they failed to do in that time period, then I guarantee you racism will continue to be alive and well."[8]

(Emphasis added.)  Both of the allegedly improper comments, when reviewed in context, are arguments inviting the jury to return a verdict that compensates Danielson for the harm that he experienced.

Finally, even if the language at closing argument could have caused some passion or prejudice in the jury to hold the hospital accountable for all racism, the jury was instructed that the value of damages should "reasonably and fairly compensate [Danielson]."  We presume the jury followed the court's instructions. State v. Emery, 174 Wn.2d 741, 766, 278 P.3d 653 (2012).

This court can therefore not hold upon review that the jury's award was "unmistakably" based on passion or prejudice.  Coogan, 197 Wn.2d at 814.  We find no abuse of discretion.[9]

---

[8] Although the hospital objected to the first comment in closing argument, it did not object to this comment in the rebuttal, or request a curative instruction.  A party waives review of an allegedly improper comment if they do not timely object. Collins v. Clark County Fire Dist. No. 5, 155 Wn. App. 48, 97, 231 P.3d 1211 (2010).  This is especially true when, as in this case, "the trial court instructs the jury that arguments are not evidence and that argument not supported by evidence is to be disregarded."  Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wn.2d 299, 334, 858 P.2d 1054 (1993).  The hospital therefore may have also waived the argument that Danielson's comments during rebuttal improperly sparked passion or prejudice.

[9] The court granted Danielson's request for attorney fees under RCW 49.60.030 in the amount of $2,068,582.49.  The hospital challenges the award of fees on the grounds that the verdict itself must be reversed.  Since we affirm the judgment, we also affirm the attorney fee award.

### III.    CONCLUSION

We affirm the trial court's order.

_Díaz, J._

WE CONCUR:

_Bui, J._                    _Mann, J._